**LOCTITE CORPORATION and Woodhill/Permatex, Inc., and Loctite Puerto Rico, Inc., Plaintiffs,**

v.

**NATIONAL STARCH AND CHEMICAL CORP. and Permabond International Corp., Defendants.**

**78 Civ. 916 (LBS).**

United States District Court,
S. D. New York.

March 25, 1981.

---

Williamson & Williamson, New York City, for plaintiffs; Jerold Goldstein, and Gail Siegel, New York City, of counsel.

James & Franklin, P.C., New York City, for defendants; Harold James, and Neal Rosenberg, New York City, of counsel.

## OPINION
SAND, District Judge.

This trademark and unfair competition suit concerns the rights of one manufacturer of cyanoacrylate adhesive to preclude a competitor's use of the term "Super Glue" [1]

---

1. For clarity, throughout this opinion we have used the term "Super Glue" as a standard form of reference meant to stand for all of the different forms the term could take, e. g., "super

with reference to its cyanoacrylate adhesive product. Plaintiffs sue: under the Lanham Act, 15 U.S.C. Section 1114(1), for infringement of a federally registered trademark; under 15 U.S.C. Section 1125(a), for false designation, description, and representation of goods as to their nature and origin; for infringement of common law rights in a trademark; for unfair competition; for relief under N.Y.Gen.Bus. Law Section 368–d (McKinney); and under 15 U.S.C. Sections 1064 and 1119, for cancellation of a federally registered trademark. By way of relief, plaintiffs seek: (a) a permanent injunction prohibiting defendants' use of "Super Glue" and other injunctive relief; (b) an order directing the Commissioner of the United States Patent and Trademark Office (hereinafter "Commissioner") to amend the identification of goods on plaintiffs' registration of "Super Glue" on the Supplemental Register to "use on cyanoacrylate adhesive"; (c) an order directing the Commissioner to cancel defendants' registration on the Principal Register of a mark further identified below but including the term "Permabond"; (d) damages; and (e) attorneys' fees. Plaintiffs allege jurisdiction under 15 U.S.C. Section 1121 and 28 U.S.C. Sections 1332(a), 1338(a), 1338(b), 2201, and 2202.

Defendants counterclaim: to cancel plaintiffs' registration of "Super Glue" on the Supplemental Register, and for unfair competition. Defendants seek: (a) an order directing the Commissioner to cancel plaintiffs' registration of "Super Glue" on the Supplemental Register and other injunctive relief; (b) damages; and (c) attorneys' fees.

After a trial on the merits, in which the Court deferred consideration of damages, attorneys' fees, and the applicability of a laches defense which defendants sought to interpose,[2] the Court reaches the findings of fact and conclusions of law set forth below.

I. *Facts*

Plaintiffs and defendants manufacture[3] cyanoacrylate adhesive, which is a rapid setting and strong bonding adhesive cement. So far as appears, the contents of plaintiffs' and defendants' tubes of cyanoacrylate adhesive are identical.[4]

As we noted in our earlier opinion, denying one and staying the second of defendants' summary judgment motions, *see Loctite Corp. v. National Starch and Chemical Corp.*, No. 78–916 (S.D.N.Y. July 20, 1979), although cyanoacrylate has been marketed for industrial use for approximately twenty-five years, it was not sold in the consumer market until 1971. The marketing and sale to consumers of cyanoacrylate adhesives began with Messrs. Klaris and Plonchak. Mr. Klaris was, among other occupations, an importer of loose cultured pearls which he mounted for resale. He was dissatisfied with the adhesives used for this purpose and this led him to Mr. Plonchak who had a background in adhesives. They first perceived the existence of a consumer market for cyanoacrylate adhesives.

glue," "superglue," "Superglue," "Super Glue," "SUPERGLUE," and the same forms without quotation marks. Our conclusion as to its generic nature might make a more appropriate form of reference to the product one which is lower case and without the quotation marks, *i. e.*, super glue. However, since we are discussing the term *itself*, we use quotation marks and designate, in a necessarily somewhat arbitrary fashion, one particular form of the term to stand for all of its variants.

2. Since plaintiffs' complaint is dismissed on other grounds, we need not reach the question of laches.

3. Initially the predecessors in interest of both plaintiffs and defendants marketed products manufactured by others, but thereafter each acquired manufacturing facilities.

4. Plaintiffs state,
The plaintiffs' and defendants' marketing practices are identical, *i. e.*, the products are the same, the marks are identical, the companies are in direct competition, the type of purchasers are the same, the products are distributed and sold throughout the same type of outlets at the retail level; the products are sold in point of purchase displays with headers that are used as eyecatchers, and the advertising and sales promotion methods are substantially the same.
Plaintiffs' Chronology at 55–56. [At the Court's request both parties have submitted chronological statements of their alleged relevant activities.]

Messrs. Klaris and Plonchak first sold cyanoacrylate through the Rexco Corporation (hereinafter "Rexco"). Rexco came into existence in 1968 and was incorporated in 1969. Rexco's sole product was cyanoacrylate sold in the industrial market.

By 1971, Rexco had changed its name to Permabond International Corporation (hereinafter "PI"). In December of 1975, defendant National Starch and Chemical Corporation (hereinafter "National") acquired co-defendant PI. PI is presently a wholly-owned subsidiary of National.

PI (or Rexco) on September 16, 1969, acquired Trademark Registration No. 876,-820 from an earlier unrelated company. This is a federal registration on the Principal Register of a mark consisting of a background letter "H" within which is the word "*Perma-bond*" and beneath that word, in smaller type, the words "Super Strength Glue."

In 1971, PI began marketing cyanoacrylate as a consumer product. As noted, it was the first company to do so. During 1971 and 1972, PI was the only company selling cyanoacrylate in the consumer market. Cyanoacrylate was then the company's only consumer product.

When PI began to market cyanoacrylate as a consumer product, it distributed the product through retail chains and mail order houses. In June of 1972, ProTel Products (hereinafter "ProTel") became the exclusive distributor for PI's product, and remained so until the end of 1972, after which it was a non-exclusive but predominant distributor.

PI's cyanoacrylate was sold to the consumer market in tubes on blister cards. At first, PI's blister card most prominently displayed the word "Permabond," and beneath that, in larger type, "Adhesive Power!". Starting at the end of 1972, PI's blister card was changed so that the heading read,

NEW
PERMABOND
ADHESIVE POWER
IN SECONDS

The word in the largest type was "Permabond," and "Adhesive Power" was in the next largest type.[5]

PI spent several thousand dollars on advertising in 1972, not using the term "Super Glue." Sales in 1972 were between one million and one and a half million tubes.

In 1973, PI ceased to be the only company selling cyanoacrylate adhesives to the consumer market. Krazy Glue entered the market and conducted extensive television advertising. Other competing brands on the market included "Super Three Cement" and "Super Bonder," the latter being the brand put out by co-plaintiff Loctite Corporation (hereinafter "Loctite") but otherwise irrelevant to this litigation. Moreover, this is the year in which plaintiffs' relevant activities began.

The plaintiff now known as Woodhill/Permatex, Inc. (hereinafter "Woodhill") and formerly known as Woodhill Chemical Sales Corporation (in June of 1974 Loctite acquired Woodhill as a wholly-owned subsidiary), decided in February of 1973 to market a cyanoacrylate adhesive in the consumer market. Woodhill agreed to purchase its cyanoacrylate from a Japanese company whose cyanoacrylate was already available in the consumer market as "Super Three Cement." Woodhill commenced development of its marketing program. By May of 1973, Woodhill had chosen "Super Glue" as the name for its product. The first disclosure of its term to its sales force was in August, and in October, Woodhill's brand of cyanoacrylate adhesive was displayed and offered for sale at the Automotive Parts and Accessories Show. In November, 1973, Woodhill received the first orders for its product. From then through

5. Plaintiffs also refer us to a third variation on the "Adhesive Power" blister cards put out by defendants:
PERMABOND
ADHESIVE POWER
SETS IN SECONDS
Plaintiffs' Chronology at 4.

February 28, 1974, Woodhill continued to receive orders.

Meanwhile, PI's 1973 activities were as follows: In the latter part of 1973,[6] PI decided to introduce a smaller blister card and to change the wording so that the smaller blister cards would not include the words "Adhesive Power" and instead would read,

PERMABOND
THE SUPER GLUE
THAT SETS IN SECONDS.

The word in the largest type was "Permabond" and the words in the next largest type were "The Super Glue." The graphics for this new small card were completed before the end of the year. The reason for the introduction of a smaller blister card was to save space on store counters. The reason defendants give for the abandonment of "Adhesive Power" was that "[i]t was in this general period that the term 'Black Power' antagonized many persons." Defendants' Post-Trial Brief at 37.

The new small card was not printed in 1973. However, a window banner for display by retailers was designed and printed in October or November of 1973.[7] Defendants recite that it

carried a picture of two jeeps trying to pull apart two items held together by cyanoacrylate, and carried the prominent legend "The Super Glue That Sets in

Seconds." These banners were first printed in November of 1973, were distributed to retailers immediately thereafter, and continued to be so distributed for many years thereafter [until modified in 1976], primarily by being enclosed as a matter of routine in cartons containing the blister packs that were shipped to the stores.

Defendants' Post-Trial Brief at 38 (citations to record omitted). The text of the window banner was "Permabond The Super Glue That Sets in Seconds Available Here."

PI conducted television advertising during 1973, under ProTel's control.

PI's new small card was printed in January of 1974, and the first shipments were made to customers the same month.[8] However, earlier in the month, Messrs. Plonchak and Klaris had become aware that the Consumer Products Safety Commission (hereinafter "CPSC") had announced a ban on cyanoacrylate adhesives. Plonchak and Harold Cole of ProTel sought and were granted a conference with the CPSC. An agreement was reached whereby a cautionary instruction would be placed on the tubes and packages of the adhesives and the CPSC ban would be lifted. The actions of the CPSC, which was a newly created governmental body, received significant public attention and media coverage, this being

6. There has been considerable conflict between the parties concerning when defendants first switched from "Adhesive Power" to "Super Glue" language. Plaintiffs have claimed that that the switch did not occur until March of 1975. Plaintiffs' Chronology at 7. There was testimony by the printer of the blister cards in his pretrial deposition (though he recanted at trial) that he had "reconstructed" a bill form reflecting the activity which took place in 1973. (The witness did not tell defendants about the "reconstruction" until just before his deposition.) However, there was also testimony at trial that defendants were holding up the production of their new small blister card switching to "Super Glue" language, pending a resolution of the CPSC ban problem. There was further testimony that when the CPSC revoked its ban, defendants telephoned their packager and gave the go-ahead for production of the new packaging. We find this testimony credible and on balance, after consideration of all the evidence, we accept defendants' version of these facts.

7. We have considered all the testimony concerning the window banners, including the testimony of an executive at National concerning when he had one of the banners in his office. We find, and so reflect in our opinion infra, that the window banners were printed and used at the times claimed by defendants.

8. Plaintiffs claim the new blister cards with the "Super Glue" language "did not appear in the marketplace until the latter part of 1975, because defendant Permabond used its inventory of almost 500,000 cards prior to distribution." Plaintiffs' Chronology at 10 (citations to record omitted.) We find, however, that defendants used both the old and new versions of their blister cards simultaneously, and used up their inventory of old cards in that fashion. We accept defendants' version of when the new cards were first shipped to customers.

one of its first interventions on behalf of consumers.

The new small blister cards which PI printed and shipped in January contained the CPSC warning language. These small cards were thereafter used, together with larger cards, by PI. ProTel did not use these cards but continued to use cards bearing the "Adhesive Power" language.

On February 28, 1974, Woodhill made the first shipment of its cyanoacrylate. The blister card carried the language "Duro Super Glue." On November 14, 1974, Woodhill began to use a new card bearing the legend "Duro Super Glue 3," and similarly printed publicity and display material was created and used. Also, on November 7, Woodhill filed an application for registration of the term "Super Glue" on the Principal Register. That application was denied on May 14, 1975. Woodhill subsequently amended its application to request registration on the Supplemental Register.

In all of 1974, there was no consumer advertising by Woodhill. Plaintiffs' sales figures for 1974–79 have been disclosed to the Court in a portion of a document which has been sealed as confidential.[9] The sales have been extensive.

9. The figures are set forth in Plaintiffs' Chronology at 15.

10. Plaintiffs state in their Chronology at 53–54:
> Third party usage of the term on cyanoacrylate adhesive from 1974 through 1976 was minimal.
> From 1974 through 1976 only two companies used the term.
> *Crackerbarrel*
> Crackerbarrel used the term in advertisements from July through October 1974.
> There is no proof of sales or proof that the term was used on the packaging of the product.
> *Wilhold Glues, Inc.*
> Wilhold Glues, Inc. has sold a cyanoacrylate adhesive product from August 1975 to date.
> For the year 1975 no proof was adduced as to sales.
> In 1976 unit sales were between 50,000–75,000.

Plaintiffs also have brought out the fact that a number of the companies which have been selling cyanoacrylates and using "Super Glue" terminology thereon, have a relationship to defendants. Plaintiffs recite:

Also in 1974, Devcon entered the consumer cyanoacrylate market, and Crackerbarrel used the term "Super Glue" on a cyanoacrylate from June or July to November.[10]

In February of 1975 ProTel agreed to drop the old "Adhesive Power" wording in favor of the new wording on the blister cards.

The first cards, large ones, were printed and shipped to [ProTel] by March or April [ , 1975]. Later small . . . cards [with the "Super Glue" language] were shipped to and used by [ProTel], and thereafter all new printings of cards, no matter what name was on the bottom were of the ["Super Glue"] category. The old ["Adhesive Power"] cards were used up, but over a period of time, and the ["Super Glue"] cards were for a period of time used along with the old ["Adhesive Power"] cards.

Defendants' Chronology (unpaginated) (citations to record omitted).

In September of 1975 there was PI newspaper advertising using the term "Super Glue." Also in 1975, ProTel-controlled television advertising continued.[11] "The last

10. Plaintiffs recite in their Chronology at 53–54:
> The companies listed below that use the term SUPER GLUE in their packaging or promotion have been supplied with cyanoacrylate adhesive by defendant Permabond or are distributors of Permabond's product: Ross Chemical Corp., Super Glue Corp., Red Devil, Inc., Leech Products Inc., Custom Model Products, Victor Automotive (distributor), Glenmarc Manufacturing Corp. (distributor), G. C. Electronics (distributor), Bond Adhesives (distributor).
> *Id.* at 54 (citations to record omitted.) They state that, "The majority of the companies using the term 'SUPER GLUE' were either being supplied with cyanoacrylate adhesive by Permabond or were distributors of Permabond's product." *Id.* at 33. *See also id.* at 22, 34. (Citations to record omitted.)

11. Plaintiffs recite in their Chronology at 28:
> From 1972 through the middle of 1977, the television advertising for Permabond's brands of consumer cyanoacrylate adhesive did not contain any audio or pictorial references to the phrase "SUPER GLUE," with the exception of one commercial shown sometime in 1976, which showed a blister card at the end of the commercial that con-

spot created by ProTel showed the . . . card [using the "Super Glue" language] at the end of the commercials." Defendants' Chronology (citations to record omitted). In 1975, PI added a product called "Fun-Tak" to its line.[12]

Throughout 1975 Woodhill used "Duro Super Glue 3" on its blister cards and corresponding publicity material. Plaintiffs state that in the same year "Woodhill announced to the trade that it was launching a national television campaign to promote its . . . cyanoacrylate adhesive," Plaintiffs' Chronology at 5 (citations to record omitted), and that on March 26, 1975, Woodhill began television advertising, id. at 16. Three television commercials were created by Marcus Advertising. The audio references were to "Duro Super Glue 3," "Super Glue 3," and "Duro Super Glue." The video displays were of "Duro Super Glue 3." There was also a single print ad directed to consumers. Plaintiffs' advertising expenditures for 1975–79 are set forth in the margin.[13]

Plaintiffs recite that, "In 1974 and 1975, Woodhill, Krazy Glue, and defendant Permabond were the major marketers of cyanoacrylate adhesive." Plaintiffs' Chronology at 5 (citations to record omitted).

Also, on May 15, 1975, Wilhold started to market a cyanoacrylate bearing the term "Super Glue," an activity which has continued to the present.

During 1976, PI and ProTel continued to use blister cards with the "Super Glue" language. Plaintiff Woodhill admits learning early in 1976 of PI's use of "Super Glue." See Plaintiffs' Chronology at 11.

Woodhill was granted U. S. Trademark Registration No. 1,030,393 on the Supplemental Register for the term "Super Glue" on January 13, 1976.[14] Also in 1976, Woodhill retained a new advertising agency which created four commercials. Audio references were to "Duro Super Glue 3," "Super Glue 3," and "Duro Super Glue." Video references were to "Duro Super Glue 3."

In May of 1977, PI terminated the ProTel distributorship. PI took over its own television advertising and spent about $2,000,000 for this advertising over the next three years. Also in 1977, PI added contact cement and "Wood-Lok" to its line. In December of that year work began on a new blister card, to read:

PERMABOND
SUPER GLUE

That new card came out in February or March of 1978. In the same year new PI commercials were created, which ended with the words, "the only super glue that

tained "The Super Glue That Sets in Seconds" language.

In 1977, Permabond began to do its own television advertising for its brand of cyanoacrylate adhesive, and continuously to the present date, Permabond has used the phrase "SUPER GLUE" on its television commercials promoting its brand of cyanoacrylate adhesive.

The use of SUPER GLUE in the commercials has been prominent in the audio and visual parts of the commercial.

(Citations to record omitted.)

12. "Permabond" originally appeared on defendants' product. Thereafter when other product lines were added "Permabond" was used as a housemark on five different adhesive products. Plaintiffs' Chronology at 44.

"Duro" has functioned as plaintiffs' housemark.

13. Total advertising expenditures for plaintiffs' product, including television advertising expenditures, have been:

| 1975 | $ 620,117 |
|---|---|
| 1976 | 808,852 |
| 1977 | 1,885,225 |
| 1978 | 1,982,696 |
| 1979 | 1,019,511 |
| TOTAL | $6,316,401 |

Plaintiffs' Chronology at 16.

14. This trademark registration and the trademark rights for "Super Glue" were assigned from Woodhill to Loctite, and subsequently from Loctite to Loctite of Puerto Rico, Inc. Woodhill, with Loctite's permission, had the right to use "Super Glue" in connection with Woodhill's marketing of cyanoacrylate adhesive. Woodhill now, with the permission of Loctite of Puerto Rico, Inc., continues to have the right to use "Super Glue" in such marketing. Plaintiffs' Chronology at 10–11.

you can use to the last drop." In the video appeared the words "the only SUPER GLUE that doesn't clog." Defendants' Chronology. Also in 1978, epoxy strips and two anaerobics were added to the Perma-bond line. The following year a new window banner was produced with the language "the only super glue you can use to the last drop." Also, the company added a rearview mirror adhesive to its line.

Plaintiffs commenced the instant action in March of 1978. That fall, Woodhill changed its blister card, dropping the "3" from the wording so that it then read "Duro Super Glue." Also, another television spot was created.[15]

## II. *Status of the Term "Super Glue"*

Plaintiffs contend that the term "Super Glue" is a valid trademark in which they have proprietary rights. They base their claim on a categorization of "Super Glue" as a descriptive term which has acquired secondary meaning. Plaintiffs also have occasionally argued that "Super Glue" is a suggestive term, *see* Plaintiffs' Post Trial Brief at 97–100, although elsewhere they have conceded that the term is descriptive. We reach the conclusion set forth herein without reliance upon plaintiffs' inconsistent concession.

Defendants argue on the other hand that "Super Glue" is a generic term, or if not generic, is a descriptive term without secondary meaning.

In *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976), the Court of Appeals set forth a four-part categorization of terms for trademark purposes:

The cases, and in some instances the Lanham Act, identify four different categories of terms with respect to trademark protection. Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.

The court went on to describe each of these categories and to review their different trademark treatment.

Both parties have introduced voluminous exhibits to demonstrate the use of the term "Super Glue". We are persuaded by this record that starting no later than early 1974, "Super Glue" has been used and understood as a term which is generic[16] or alternatively, at least descriptive. In the latter case, it has acquired no secondary meaning in favor of plaintiffs.

### A. *As a Generic Term*

Our finding that "Super Glue" is a generic term is based on applying to the record in this case the standard which has been articulated repeatedly in this circuit:

The basic question, one of fact, under the test formulated many years ago by Judge Learned Hand and followed since, is: "What do the buyers understand by the word for whose use the parties are contending?" The standard to be applied in determining whether a term is generic is not whether it has *some* significance to the public as an indication of the nature or class of the article, but whether that is its *principal* significance.

---

**15.** Meanwhile the new activities of others in the cyanoacrylate market for the years 1976 through 1978 were as follows. Early in 1976, Ross entered the field but without using the term "Super Glue"; Magic American used "Super Adhesive Glue" on their package in May; and Red Devil entered the field with "Cyanoacrylate Super Glue" in November. In 1977,

Super Glue Corporation entered the field with its "Gripper Super Glue" beginning in January and continuing to the present date. Ross commenced using "super glue" on its card before the end of 1977.

Custom Model Products entered the field with its "Super Glue" in September.

Leech changed to Super Glue on its blister cards late in the year.

Defendants' Chronology (citations to record omitted). Also, there was similar activity by Adhesive Machinery Corporation. *Id.* In 1978, "Glenmark entered the field with its 'Un-Bond', described on its brochure as a remover for super glues." *Id.* (citations to record omitted.)

**16.** In our prior opinion denying summary judgment, we concluded that "Super Glue" is not inherently generic. We are now persuaded that, at least by early 1974, the consuming public had come to understand it as a generic term.

*Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 490 (S.D.N.Y.1968) (footnotes omitted). *Accord, King-Seeley Thermos Co. v. Aladdin Industries, Inc.*, 321 F.2d 577, 580 (2d Cir. 1963); *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251, 256 (2d Cir.), *cert. denied*, 371 U.S. 910, 183 S.Ct. 253, 9 L.Ed.2d 170 (1962).

We find that the principal significance of ·"Super Glue" to the relevant public [17] is that of a designation of a kind of glue which is rapid setting and strong bonding, denominating the category of cyanoacrylate adhesives or a category including them. We glean this primarily from the usage of the term in the media, other than in trade publications (since it is the understanding of the consumer public which is relevant here) and other than in the parties' advertisements, retail advertisements, and catalogues (where control or possible control by the parties over usage diminishes evidentiary value).

It appears to us that at the time of the media coverage of the CPSC ban in early 1974, "Super Glue" already occupied or then achieved a generic status. Contemporaneous press releases and articles show generic use of the term. A headline writer for the Detroit Free Press, for example, captioned a story on the CPSC ban, "Super-Glue Disappearing." Cole Exhibit 13. In the Los Angeles Times the headline read "Hazards in Superglue Reported; Sales Halted." Cole Exhibit 13A. These and other instances of usage indicate that by early 1974 "Super Glue" was used as a generic term in lieu of the cumbersome mouthful "cyanoacrylate adhesive." [18]

Our conclusion as to the status of "Super Glue" in early 1974, furthermore, is based on the fact that at the time of the CPSC ban and this generic usage of the term by the media, no manufacturer, including plaintiffs, had yet to any significant extent exposed consumers to the term as part of the name of a particular cyanoacrylate adhesive.[19] Therefore, the generic usage of "Super Glue" in the media in early 1974 occurs against a background of essentially no exposure of the term to the public in an even arguably trademark sense on a cyanoacrylate.

The only companies that were using the term "Super Glue" on their adhesive products prior to early 1974 were companies producing various non-cyanoacrylate adhesives, *see* Defendants' Chronology, and defendants cite these usages in support of their contention that the relevant market is household adhesives and that "Super Glue" is not a trademark for plaintiffs' cyanoacrylate. However, we do not find such usage of the term with reference to various non-cyanoacrylate products, even if there were arguably trademark usages, to weigh significantly with reference whether the term was functioning generically as to cyanoacrylates in early 1974. Cyanoacrylates were first marketed to consumers in 1971. Faced

---

17. In the circumstances of this case it matters not whether the relevant universe is deemed to be actual purchasers of cyanoacrylate adhesives or actual and potential purchasers. The latter group encompasses all adults in America.

18. Utilization of the term by a headline writer in a newspaper of general circulation is significant evidence that, in the contemporaneous view of a professional communicator, the term was generic.

Although the quantity of newspaper articles ultimately received in evidence using "Super Glue" in a generic sense is not overwhelming, we note that in some instances the articles, especially those relating to the CPSC actions, originate from a wire service and doubtless had a broader circulation than the specific articles introduced. Many of these stories were inspired by a press conference held by the CPSC at which the term "Super Glue" was used. Although the CPSC apparently issued no formal press release, its files contain the wire service copy reporting the press conference using "Super Glue" generically. We accept and agree with the testimony of Mr. Plonchak that it was the CPSC episode which gave currency to the term "Super Glue" as a generic term for cyanoacrylate adhesives.

19. Plaintiffs assert that they displayed and offered their product for sale at the Automotive Parts and Accessories Show in October of 1973 and that they received their first orders for their product the following month. However, their first shipment of the product did not take place until February 28, 1974, and in 1974 plaintiffs engaged in no consumer advertising.

with a new product category, whose chemical name, "cyanoacrylate," is difficult to pronounce and to recall, it would not be surprising for the public to seize upon a term which already had some currency in a related context.

. It in fact may be that there has been some variation in the public understanding as to what the category designated by the term "Super Glue" includes (*i. e.*, only cyanoacrylates, as opposed to some other adhesives such as epoxies as well). Such variation does not disturb our conclusion as to the generic character of "Super Glue" applied to cyanoacrylates. *Cf. Cummins Engine Co. v. Continental Motors Corp.*, 359 F.2d 892, 894 (C.C.P.A.1966) ("turbodiesel" generic; "it is not required that the name precisely describe and define the goods in order to be incapable of registration"). Assuming *arguendo* there was some trademark usage of "Super Glue" on non-cyanoacrylates leading up to early 1974, we find as a factual matter that as applied to cyanoacrylates, the term was generic by early 1974. Therefore, "Super Glue" was a generic term with reference to cyanoacrylates before plaintiffs began to expose consumers, to any significant extent, to what they claim to be a trademark usage of the term with reference to this category of glues.

The fact that there have been other terms used to denominate the category of cyanoacrylate adhesives also does not disturb our finding as to the generic character of "Super Glue." Terms such as "instant glue" and "ten second glue" have been used to some extent in addition to "Super Glue." However, the existence of synonyms for a term does not mean the term is not generic. There may be more than one term which the consuming public understands as designating a category of goods. *See King-Seeley*, 321 F.2d at 580.

Moreover, we find that at all times since early 1974, "Super Glue" has continued to be a generic term. In other words, the principal significance of the term in the mind of the consuming public has continued to be the designation of a category of product. We base this finding on non-advertising, non-catalogue, non-trade media usage (for reasons indicated above) over time.

B. *As a Descriptive Term*

Alternatively, we find the term to have been a descriptive one, but, as we set forth below in Section III, a descriptive term without secondary meaning. Whether the term is regarded as a generic one or as a descriptive term without secondary meaning does not alter the fate of the claims in this case.

As we have noted at page 199 *supra*, plaintiffs have at some points gone so far as to argue that "Super Glue" is neither generic nor descriptive but rather suggestive. We reject that contention. In *Abercrombie*, 537 F.2d at 11, the Court of Appeals quoted language from *Stix*, 295 F.Supp. at 488, on the difference between a suggestive and a descriptive term: " 'A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.' "

■ At all times relevant to this litigation, the term "Super Glue" has conveyed to the relevant public [20] "an immediate idea of the ingredients, qualities or characteristics of" cyanoacrylate adhesive, namely that it is a glue of exceptional properties, in terms of strength and/or speed of setting. "Super Glue" is not in the category of a suggestive term. The evidence in this case shows that at the time plaintiffs began to use the term "Super Glue," there was in fact an understanding of the term such that it imparted "some reasonably accurate ... knowledge" as to the nature of the product to the population of prospective purchasers. *See Blisscraft of Hollywood v. United Plas-*

---

**20.** Our views as to the appropriate universe with respect to the status of the term as a generic, expressed at note 17 *supra*, apply equally here.

*tics Co.*, 294 F.2d 694, 699–700 (2d Cir. 1961).[21]

In *Stix*, the court found that "contact," when used in reference to self-adhesive decorative plastic was neither generic nor descriptive. In rejecting the characterization of "contact" as descriptive, the court said, in addition to the language which, as we have noted above, was cited in *Abercrombie*,

> A test of descriptiveness is whether the word conveys the characteristics, functions, qualities or ingredients of a product to one who has never seen it and does not know what it is. So tested, the word "contact" by itself does not convey to one unfamiliar with self-adhesive decorating plastics the quality of self-adhesion and the means by which the product is applied.[23]
>
> > [Footnote 23: "Shulman testified that the particular quality of adhesion is the 'unique' property of these products."] . . .
>
> The test is "whether the subject is so close and direct that it is apparently descriptive and generally useful in approximately that form to all merchants marketing such goods, or is so remote and subtle that it is fanciful and not needed by other merchants of similar goods."

*Id.* 295 F.Supp. at 487–88 (footnotes omitted).

■ Judge Weinfeld's analysis in *Stix*, applied to the case at hand, leads to the conclusion that as between suggestive and descriptive, "Super Glue" is descriptive. The term will convey to someone who has never seen the product and does not know what it is the idea that this glue is "super," *i. e.*, has to an exceptional extent the salient qualities of glue. This is a true characterization of cyanoacrylates, because they are in fact exceptionally strong bonding and rapid setting. Moreover, in contrast to the mark in question in *Stix*, there are numerous public usages of "Super Glue" in the media which indicate that "Super Glue" is and has been generally understood as being descriptive of the product in question.

"Super Glue" is descriptive also under the test of " 'whether the subject is so close and direct that it is apparently descriptive and generally useful in approximately that form to all merchants marketing such goods, or is so remote and subtle that it is fanciful and not needed by other merchants of similar goods.' " *Id.* at 488 (footnote omitted). We infer this general usefulness, from the fact that a significant amount of non-advertising media reporting on cyanoacrylates uses the term "Super Glue" or some version thereof (*e. g.*, "Superglue," "Super-glue") in referring to cyanoacrylates. As to merchants' need of the term, there have been other terms in use for cyanoacrylates, such that a merchant would not be compelled to use the term "Super Glue." However, as we said above with regard to generic terms, there is no reason why the existence of synonyms or alternative forms of description should disturb the fact of the descriptiveness of any given term. "[I]f the term does in fact describe the goods, it is immaterial whether others use that term or use other words to describe them." 3 Callman at 113 (footnote omitted).

Plaintiffs point to that segment of the *Stix* opinion which found support for the conclusion that "contact" is not a descriptive term in the fact that the Patent Office had on a number of occasions accepted "CON–TACT" for registration as a mark referring to self-adhesive decorating plastics. The *Stix* court found such support because "the Patent Office is empowered to refuse registration of a mark that is 'merely descriptive' of goods." *Id.* (footnote omitted). Plaintiffs would have us reason that:

> the fact that the term SUPER has been repeatedly accepted by the United States

---

21. Moreover, Callmann states, "If a considerable portion of the purchasing public considers the word descriptive, it is descriptive . . ." 3 R. Callmann, the Law of Unfair Competition Trademarks and Monopolies at 113 (3d Ed. 1969 & Supp.1980) (footnote omitted) (hereinafter "Callmann"). We additionally expressly find this standard to have been met. Indeed, we find that a predominant segment of the relevant public considers, and at all relevant times has considered the word to be either descriptive or generic.

Patent Office for registration when combined with a second word which denotes the product is probative evidence that a term combining SUPER with another word is not descriptive and does not convey without any further explanation the type of product or its characteristics, but rather is suggestive.

Plaintiffs' Post Trial Brief at 99–100 (citations omitted).

■ However, we are not persuaded that such registrations are probative in the case at hand. In contrast to the situation in *Stix*, plaintiffs point us, not to prior registrations of the term over which the parties are disputing, namely, "Super Glue," but rather to registrations of other terms the first of whose two words is "super." With respect to registration on the Principal Register, "the decision of the Patent Office to register a mark without requiring proof of secondary meaning affords a rebuttable presumption that the mark is suggestive or arbitrary or fanciful rather than merely descriptive." *Abercrombie*, 537 F.2d at 11. However, registration on the Supplemental Register cannot provide this rebuttable presumption because even descriptive terms can be registered on the Supplemental Register without proof of secondary meaning, as long as they are deemed capable of acquiring such meaning. Plaintiffs' registration of "Super Glue" is on the Supplemental Register.

■ Since any other of the registrations to which plaintiffs point, if they are on the Supplemental Register, will not afford plaintiffs the basis for urging upon us the inference that "Super Glue" is suggestive rather than descriptive, we assume *arguendo* that the registrations are on the Principal Register and were registered without proof of secondary meaning. However, the resultant presumption is rebuttable in every case and since the case at hand and the evidence presented concerns only "Super Glue" we cannot tell whether the presumption would stand or be rebutted as to other terms. However, even if these other terms are suggestive, this is not inconsistent with

"Super Glue" being descriptive. "Super Glue" is a term which has passed into public parlance such that it is immediately informational. This may not have occurred with respect to a term such as "Super Curl," to cite one of plaintiffs' registered examples. Moreover, the term "Super Glue" may have intrinsically more informational content than a term such as "Super Curl" or the other registered "super" terms. "Glue" is an obvious designation of the category of the product, and in the context of cyanoacrylate adhesives, "Super" is not simply laudatory but rather truly informational, because the distinguishing characteristic of cyanoacrylates is that, as to salient characteristics of glue, cyanoacrylates have those characteristics to an extraordinary, or "super" extent; they are a sort of miracle glue. Callmann writes,

[The] emotive function of language is what has been called suggestive. The more the communicative aspect of the word dominates its emotive function, the more assuredly is it descriptive and available for use by all. There is an acid test for such descriptiveness: Does the mark advise a prospective buyer of particular characteristics of the article offered for sale? When the mark is confined to a general characterization, there is obviously no attempt to impart any real information or advise the purchaser. Those who buy a valve naturally assume and expect that it will be durable; therefore, a word referring to durability as "everlasting" is not a proper word of description but of suggestion: "Any one who knows a valve, as all purchasers of valves may be presumed to do, knows of its durable qualities as well without the label as with it." ... Therefore, all such usages are suggestive and not descriptive.... Merely laudatory words are designed to evoke an emotional response; they are used for their emotive value exclusively.

3 Callmann at 170–71 (footnotes omitted).[22]

We thus find "Super Glue" to be no more than descriptive, if not generic.

22. The registration to which plaintiffs point us which is closest to "Super Glue" is "Supera-

III. *Secondary Meaning*

Since "Super Glue," if not generic, is, and at all relevant times has been, no stronger than descriptive, we must next inquire whether plaintiffs have proven that it is more likely than not that "Super Glue" has acquired a secondary meaning in plaintiffs' favor. See *W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 661 (2d Cir. 1970). Plaintiffs enumerate eleven types of evidence in the record which they claim support the conclusion that "Super Glue" has acquired secondary meaning:

(1) national distribution availability,

(2) millions of unit sales,

(3) high market share,

(4) national television advertising,

(5) consumer print advertising,

(6) 1977–1978 survey brand awareness results,

(7) third-party adoption of their mark,

(8) consumer correspondence,

(9) unsolicited publicity,

(10) retail promotion, and

(11) third-party trademark recognition.

Plaintiffs' Post Trial Brief at 8. Plaintiffs also have offered an analysis of viewer impressions.

 The point of an inquiry into the existence of secondary meaning in a mark is whether the relevant public [23] understands the mark as a designation of a particular origin, even an anonymous one. The Second Circuit has articulated the test to be whether "the *primary* significance of the mark in the minds of the consumers is the identification of the producer, not a designation of the product." *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2d Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). Plaintiffs contend that the test instead is whether a *substantial* part of the consuming public associates the mark with a single source. Plaintiffs' Post Trial Brief at 20, *citing inter alia Food Fair Stores, Inc. v. Lakeland Grocery Corp.*, 301 F.2d 156, 161 (4th Cir.), *cert. denied*, 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962). We find that even under the lesser, "substantial part," standard, plaintiffs have failed to prove secondary meaning.

Of the types of evidence plaintiffs list, those of greatest relevance to the test of secondary meaning are those which indicate most directly what consumers understand and understood by the term at issue, that is, plaintiffs' categories (6) and (8), survey brand awareness results and consumer correspondence. The viewer impressions evidence is also in this category. In each of these cases, the Court is presented with evidence originating from consumers themselves (though filtered through others in the sense that surveys, for instance, represent interpretation, not a mere reporting), rather then the parties' advertising or competitors' uses. Moreover, these three types of evidence represent an effort to test the

---

poxy." However, there is no inconsistency between the latter term being suggestive and the former descriptive. There may be determinative differences in the history of the entry of "glue" and "epoxy", and also of "Super Glue" and "Superapoxy" into public parlance and the public's understanding of the respective terms. Moreover, it may be that "super" attached to "epoxy" is purely laudatory, if there is not a separate category of epoxies which are distinguished by exceptional versions of the standard epoxy characteristics (whatever they may be), and if the specific product to which the registrant affixes the term "Superapoxy" is not in such an exceptional category. As we have analyzed, *infra*, the term "Super" attached to "Glue" and used with reference to cyanoacrylates is a term with informational content, rather than merely a laudatory one.

**23.** Whether one views the relevant universe here as actual purchasers of cyanoacrylate adhesives, actual purchasers plus those reasonably likely to purchase (which is the universe plaintiffs urge upon us, *see* Plaintiffs' Post Trial Brief at 22–24), or actual and potential purchasers (which includes all adults in America), has no effect on our findings and ultimate conclusion as to the existence of secondary meaning. Nor do our findings and conclusions alter if the relevant universe here is considered to be actual purchasers of plaintiffs' product, actual purchasers plus those reasonably likely to purchase plaintiffs' product, or actual and potential purchasers of it.

actual existence of secondary meaning, rather than simply providing the basis for an inference as to the existence of secondary meaning from a demonstration that conditions, such as sizeable advertising expenditures, existed which would allow or foster the establishment of secondary meaning. We seek here not to disparage the appropriateness of inference in establishing secondary meaning, *see W. E. Bassett*, 435 F.2d at 661, but rather to put initial evidentiary emphasis where it is due. *See McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1133 n. 4 (2d Cir. 1979).

### A. *Survey brand awareness results*

Although plaintiffs now cite survey brand awareness results in support of their contention of secondary meaning, the surveys of brand awareness were originally offered into evidence not by plaintiffs but by defendants.[24] Plaintiffs, however, now seek to interpret them in a light favorable to their position.

Although plaintiffs' enumeration of types of evidence in support of secondary meaning cites only 1977–78 survey brand awareness results, there are in fact five surveys of brand awareness in evidence, including one conducted in 1976. The first survey was conducted by Yankelovich, Skelly and White, Inc., (hereinafter "Yankelovich") in late March and early April of 1976. Subse-

quently, four additional surveys were conducted by Rumrill-Hoyt, Inc., (hereinafter "Rumrill-Hoyt") in March, 1977, June, 1977, late November and early December, 1977, and June, 1978. At trial, the Court admitted into evidence all five survey reports but as to the Yankelovich survey, received the report not for the truth of its contents. In the case of each of the surveys, the Court also received into evidence a sample survey questionnaire. Also received were communications between plaintiff Woodhill and Rumrill-Hoyt, including a critique of the Yankelovich survey. The Court heard testimony from Mr. Gilfeather of Yankelovich, a defense witness; from Mr. Tortolani of Rumrill-Hoyt, also a defense witness; and from Dr. Robert C. Sorenson, an expert witness for plaintiffs, who as part of his testimony, criticized the surveys.

Plaintiffs now point us to the December, 1977, and June, 1978, Rumrill-Hoyt surveys and Mr. Tortolani's testimony in support of their contention of secondary meaning in the term "Super Glue." Plaintiffs' Post Trial Brief at 12–13. Plaintiffs assert that from the universe of glue users, *i. e.*, the entire consumer population, "[t]he brand awareness results from the . . . [two] surveys, were respectively 65% and 59%." *Id.* (citations omitted). Moreover, they assert that when the universe is restricted to peo-

---

24. In *Procter & Gamble Co. v. Johnson & Johnson, Inc.*, 485 F.Supp. 1185, 1201 n. 6 (S.D.N.Y. 1979) the court stated,

[Defendant] PPC offered evidence that [plaintiff] P&G had commissioned a confusion survey. PPC asks the court to draw an inference adverse to P&G by reason of its failure to produce the survey. I have declined to consider this as a factor because of doubts as to whether even the fact of such expert testing should be admissible when offered by the adversary. See Rule 26(b)(4)(B), F.R.Civ.P. (P&G did not object to the questions which elicited the fact of the test. It did object to a demand for the production of the test, which objection was sustained.)

PPC also argues that an inference should be drawn against P&G by reason of its failure generally to offer evidence of a confusion survey. However, the opportunity was available equally to PPC to commission and offer such a survey. An inference thus may be drawn against PPC as well.

For these reasons, I have given no significance or weight whatever to this issue.

However, it appears from that court's citation to F.R.Civ.P. 26(b)(4)(B), which governs discovery of experts "retained or specially employed by another party in anticipation of litigation or preparation for trial," that the court in *Procter & Gamble* was dealing with surveys commissioned in anticipation of litigation. In the case at hand, the surveys predated the litigation and were not conducted in anticipation of litigation. One should not discourage surveys for use in litigation, nor should one compel a party who has commissioned such a survey to introduce it at trial if it does not advance his case, particularly where his adversary "equally . . . [can] commission and offer such a survey." However, here the surveys offered tested contemporaneously a state of public knowledge which existed years prior to the litigation and which cannot now be reconstructed. Thus, defendants have not had an equal opportunity to conduct such a survey.

ple aware of the product category at the time of each survey, then the brand awareness percentages are even higher.

However, none of the surveys conducted, all of which were commissioned by plaintiffs, tested for awareness of the brand "Super Glue." The March-April 1976 Yankelovich survey tested for aided awareness of the brand "Duro Super Glue" (the contrasting categories being "Permabond," "Krazy Glue," "Other," "None," "Don't know"). Defendants' Exhibit QH at 2. The first Rumrill-Hoyt questionnaire tested for aided awareness of "Duro Super Glue" (in contrast to "Permabond," "Krazy Glue," "Eastman 910" and "Other"). Defendants' Exhibit QK at 5. The second Rumrill-Hoyt survey did the same. Defendants' Exhibit QM at 2. The third Rumrill-Hoyt survey tested aided awareness of the brand "Super Glue 3" (in contrast to the same alternatives listed in the prior two Rumrill-Hoyt surveys). Defendants' Exhibit QO at 3. The fourth Rumrill-Hoyt survey did the same testing as the third survey. Defendants' Exhibit QQ at 3.

Thus, none of these surveys, which were conducted prior to this litigation and for marketing purposes unrelated to this controversy, tested the single issue at hand here, that is, whether consumers understood the term "Super Glue" to designate glue from a single source. Moreover, in each case, the term "Super Glue" was presented to the test subjects only in connection with plaintiffs' product and not in connection with defendants', a circumstance which further reduces the probative value of the survey results for our purposes. Finally, because of the manner in which the survey results are reported and the way the questionnaires are designed, it is impossible for us to tell with reference to what products subjects used the term "Super Glue" in their responses when unaided awareness instead of aided awareness was being tested. Indeed, it is not even possible to determine whether subjects used the term at all in their responses, when unaided awareness was being tested.

### B. *Consumer correspondence*

Plaintiffs maintain that correspondence they have received from consumers supports plaintiffs' contention of secondary meaning. In support of this, they present a content analysis of 5880 letters conducted by an expert witness, Dr. Sorensen. Dr. Sorensen testified with respect to the terminology employed by the letter writers.

However, we find that this evidence is not probative on the issue of whether a significant portion of the consumer public at any relevant time has understood the term "Super Glue" as a designation of a product emanating from a single source. The set of people who wrote letters, and wrote letters to this particular manufacturer, is not a representative sample of the relevant universe, however narrowly or broadly that universe may be defined.[25] Many of the letters were complaints; for example, letters written by persons who observed that the tube clogged and could not be used more than once, a common objection to the product. These letters were written by persons who, in all likelihood, had a tube of plaintiffs' product before them. Obviously, brand awareness is high when a customer bothers to write a particular manufacturer to complain or seek a refund. The fact that such a letter arguably uses "Super Glue" to refer to plaintiffs' brand does not imply: that users of other brands of cyanoacrylates understand "Super Glue" to designate plaintiffs' brand, or that other users of plaintiffs' brand of cyanoacrylate have such an understanding, or even that the letter writers at some time when not communicating by letter to plaintiffs have such an understanding.

---

**25.** It is not a representative sample of any of the universes referred to in note 23 *supra*, nor of any analogous universes defined with reference to glue instead of cyanoacrylate adhesives. The universe of actual and potential purchasers of glue, like the analogous universe of cyanoacrylates, *see* note 23 *supra*, is the adult population, in this case, of the United States.

Moreover, even if one were to ignore the atypicality of the sample, defendants have persuaded us of other fatal flaws in the study's methodology, most significantly, that the classifications of individual written instances of the term in dispute are highly questionable. We decline to accord weight to this evidence.

C. *Viewer impressions*

Although plaintiffs do not list this category of evidence in their enumeration quoted above, they offered in further support of their contention of secondary meaning, testimony that an analysis of total viewer impressions resulting from plaintiffs' television advertising campaigns demonstrates secondary meaning.

However, plaintiffs' own expert witness testified that total viewer impressions is not a particularly meaningful statistic. He testified that the term is generally used by manufacturers to impress their distributors with the extent to which the product is being promoted. He said that it is this statistic, of all statistics possibly relevant to advertising, which furnishes the highest number. Total viewer impressions tells us nothing as to the impact on the viewer, *i. e.*, the viewer's recall and the identification which the advertising leads one to make between the mark and the particular manufacturer. In other words, it tells us nothing as to the effectiveness of the advertising. Also, it tells us nothing with respect to what other material viewers might have been exposed to, such as generic usage of the term, or use of the term by others in a trademark sense, which would counteract, or dilute, the plaintiffs' advertising. There are, of course, other devices known to the advertising and marketing professions for measuring television impact, such as viewer recall, consumer interviews, and surveys. In fact, plaintiffs commissioned the Yankelovich and Rumrill-Hoyt organizations to conduct such surveys. Because the results of these surveys are not favorable to plaintiffs' contention, they did not introduce them and when the surveys were introduced by defendants, except as noted above,

plaintiffs disparaged the methodology and validity of the surveys, as well as their relevance and applicability to the issues before the Court. But apart from the question of their use defensively by defendants, it still remains the case that plaintiffs have shown, insofar as this aspect of their proof is concerned, only that a great many Americans were exposed to their commercials. Under the circumstances of this case, we find that to be an inadequate basis to support a conclusion that plaintiffs' expenditure of their advertising dollars produced for them a secondary meaning in the marketplace.

Moreover, plaintiffs' test of viewer impressions did not test for impressions of the term "Super Glue." It tested instead for "Duro Super Glue" and "Super Glue 3." In fact, in none of the commercials during the relevant period did plaintiffs identify their product as "Super Glue" alone. The commercials referred to "Duro Super Glue" or "Super Glue 3." Therefore, the viewer impressions analysis cannot tell us whether the term "Super Glue" by itself has secondary meaning in plaintiffs' favor despite competitors' use of the term on their own products. It could be that whatever recall people demonstrate is a function not of "Super Glue" but of the other terms plaintiffs use with it. Moreover, even if there is recall of the product name as a whole, plaintiffs here seek to establish the proposition that they acquired a secondary meaning in the term "Super Glue" itself.

D. *Unsolicited publicity*

Plaintiffs maintain that "[p]laintiffs' SUPER GLUE mark has . . . received unsolicited publicity recognizing SUPER GLUE as a trademark in consumer and trade periodicals. . . ." Plaintiffs' Post Trial Brief at 18. We do not find that the record of unsolicited usage of the term "Super Glue" in the media supports the conclusion that a significant proportion of the consumer public understood or understands "Super Glue" to designate a product emanating from a single source. While there is some such usage of the term, that is, use to designate plain-

tiffs' product in particular, we do not find a significant amount of such usage appearing in such a manner that it is an adequate indication of secondary meaning.

### E. Retail promotion

Plaintiffs further assert that there has been recognition of "Super Glue" as a trademark by retailers that placed 1346 advertisements in newspapers, promoting plaintiffs' mark. *Id.* (citations omitted). However, the very ad that plaintiffs choose to photocopy and place in their brief, at 18, in support of this assertion, uses the term "Super Glue" only in association with the term "Duro." As we have indicated above, the use of the term "Super Glue" when so modified does not provide support in this case for the contention that the term "Super Glue" itself has secondary meaning.

Furthermore, we are unclear as to the extent to which this retail advertising was controlled or influenced by the plaintiff manufacturer, *e. g.*, as part of a co-operative advertising program. Usage of the contested term which was determined to some extent by plaintiffs is not a probative or persuasive indicator of public understanding. We place greater stock in the unsolicited media usage, the clear weight of which is against a finding of secondary meaning in "Super Glue."

### F. Third-party trademark recognition

Plaintiffs point to third-party use of the term "Super Glue" in labeling third parties' own products, as a recognition that the term "had trademark value." Plaintiffs' Post Trial Brief at 17. However, the third-party use of the term is consistent with the conclusion that "Super Glue" is either generic or descriptive. Where there was use of the term in a trademark fashion it only supports the inference that the using party concluded that the term was capable of acquiring secondary meaning, instead of necessarily implying the conclusion that it already had acquired secondary meaning, and in another's favor. In order for third-party usage to support plaintiffs' assertion of secondary meaning in their own favor, plaintiffs would have to show that third parties were using the term to take advantage of an existing, or at least forming (*see* section IV *infra*) secondary meaning in plaintiffs' favor.

Plaintiffs have made such an allegation. They state:

> The fact that none of the third parties are large sellers of cyanoacrylate adhesive, coupled with the fact that none of the third parties conduct any television or print advertising, leads to the inescapable conclusion that the motivation behind use of Super Glue on their packaging is to take advantage of the consumer publicity generated by Woodhill and through defendants' infringing acts, the publicity generated by defendant.

Plaintiffs' Post Trial Brief at 161–62. Plaintiffs also recite that they "have... instituted trademark infringement and unfair competition actions against three... sellers..., *Super Glue Corp.* (77 Civ. 1452, E.D.N.Y.), *Red Devil, Inc.* (78 Civ. 312, S.D. N.Y.), and *Ross Chemical Co.* (78 Civ. 3141, S.D.N.Y., transferred by consent to E.D. Mich.)." *Id.* at 162.

However, we find plaintiffs' logic less than compelling. The uses of "Super Glue" to which plaintiffs have pointed us, even in combination with small sales and no advertising, do not persuade us that these third parties considered the term to designate, to the consuming public, glue emanating from a single source, much less plaintiffs' (or even defendants') glue in particular. Plaintiffs have not persuaded us that third-party competitors were trying to take advantage of an existing or forming secondary meaning in plaintiffs' favor. Third parties may just as well have been using a generic term, or (as to use of "Super Glue" unadorned, in addition to all the other manners of use) a descriptive term without secondary meaning in anyone's favor. If plaintiffs' use of the term gave it greater currency as a generic or descriptive term, and that motivated others to use it as well, then plaintiffs must live with the consequences of having invested in a term to which they had no proprietary rights. *See* sections VI, VII

*infra.* We have found the term generic, but even if it is descriptive, not every attempt to establish secondary meaning in a term will succeed.

Moreover, the real question with regard to plaintiffs' contention of secondary meaning is what is the consuming public's understanding of the contested term, rather than what third-party manufacturers have considered that understanding to be, although others' opinions constitute evidence of the consuming public's understanding. In this case, media usage constitutes a much less ambiguous and a more direct evidentiary basis for a conclusion as to secondary meaning, and we accord it substantially greater weight.

### G. *Defendants' use of "Super Glue"*

Plaintiffs have also pointed to defendants' use of the term "Super Glue" to support their contention of secondary meaning, arguing that defendants' actions show a recognition of secondary meaning in plaintiffs' favor and an attempt to ride plaintiffs' coattails by using the term themselves. Plaintiffs in fact attempted to show that there was a meeting at which defendants and their associates plotted to take advantage of secondary meaning in plaintiffs' favor by using the term "Super Glue" themselves.

We are not persuaded of the truth of this scenario. Defendants' use of "Super Glue" in fact preceded or was contemporaneous with plaintiffs', and certainly preceded any point in time at which plaintiffs could argue they had established secondary meaning. Plaintiffs' evidence of a meeting to expropriate plaintiffs' goodwill in the term "Super Glue" is not credible. At the time the meeting is supposed to have occurred, (sometime between early 1974 and early 1975), plaintiffs could not yet have had goodwill or any secondary meaning in the term. It predates all of their advertising of the term. Nor do we find it credible that defendants were motivated by the anticipation of plaintiffs' advertising and marketing efforts.

As to defendants' later more prominent use of the term in connection with their cyanoacrylate product, when they condensed the name of their product to "Permabond Super Glue," we are not persuaded that defendants were trying to take advantage of a secondary meaning in plaintiffs' favor. The increasing prominence accorded the term by defendants may just as well have reflected the degree of popularity of the term with the consuming public as a designation of a product category or description of a type of product rather than as a designation of product source. As we noted above, if plaintiffs' efforts contributed to the popularity of a term which they had no right to monopolize, and thus encouraged more prominent use of that term, this is the risk they took. *See American Footwear,* 609 F.2d at 662; section VII *infra.*

### H. *Distribution, sales, market share, and advertising*

Plaintiffs, finally, would have us infer the existence of secondary meaning from the extent of their product's distribution availability, sales, market share, and advertising. However, we decline to make such an inference. The availability, sales, market share, and advertising of their product exist not in a vacuum, but in the context of defendants' comparable investments and achievements on those fronts. In fact, plaintiffs concede that, "By the end of 1974, Woodhill, Krazy Glue Corp., and Permabond were the major sellers of consumer cyanoacrylate adhesive, accounting for virtually all sales." Plaintiffs' Chronology at 13 (citations to record omitted). Elsewhere they state, "In 1974 and 1975, Woodhill, Krazy Glue, and defendant Permabond were the major marketers of cyanoacrylate adhesive." *Id.* at 5 (citations to record omitted). Moreover, if we confine our consideration of defendants' activities to the period after which they began using "Super Glue" language, the situation appears to be no different. Comparable and essentially contemporaneous exposure of a term to the consumer public, does not afford a basis for

inferring plaintiffs' acquisition of a secondary meaning in their favor.[26]

Moreover, whatever the size of plaintiffs' investment in the term "Super Glue," plaintiffs were not the first users of the term. They have attempted to appropriate for their exclusive use a term which was descriptive or generic and used as well by other producers at the time they first began to try to establish in the mind of the consuming public a secondary meaning. The term has remained descriptive or generic and has continued to be used by other producers. Though plaintiffs would have us believe that the context in which they were operating made the development of secondary meaning likely, in fact the context seems to us to have been one which has made such a development unlikely.

*Conclusion*

The fact is that a party may pour substantial amounts of money into creating conditions which will foster the development of secondary meaning in its favor and nonetheless may fail. We are persuaded that plaintiffs have failed here. Media usage of the term persuades us of this fact, plus others' substantial and continuous use of the term on competing items. Additionally, there was significant use of the term before plaintiffs initiated their attempt to invest it with secondary meaning, and there was another producer of cyanoacrylate, namely defendants, who either first or contemporaneously and thereafter continuously exposed the public to the term with reference to cyanoacrylates. This other user also made substantial expenditures and enjoyed a significant share of the market.

We note that plaintiffs have never used the term "Super Glue" alone on their product. They have always used the term in conjunction with the word, "Duro" and/or the numeral "3."[27] Plaintiffs' own usage of the term on its product is consistent with the notion that "Super Glue" has never had secondary meaning in anyone's favor, but

rather requires some kind of distinctive modifier in order to identify a product from a single source.

IV. *Secondary Meaning in the Making*

Since we conclude that plaintiffs have not demonstrated the existence of secondary meaning, we must turn to their contention that they have established the existence of secondary meaning in the making, giving them protectible rights to the term "Super Glue."

■ The parties dispute the viability of a doctrine of secondary meaning in the making in this circuit. However, whether or not it is appropriate to protect a party who succeeds or seems likely to succeed in establishing secondary meaning by beginning that protection at some point before secondary meaning has actually been acquired, such protection would not be appropriate here. The facts in this case show that plaintiffs have not succeeded in establishing secondary meaning, and do not show signs of succeeding in the future. "Super Glue" instead has functioned as a generic term or a descriptive term of widespread application without secondary meaning in favor of anyone. As we repeatedly note, plaintiffs were not even first users of the term. In this context, to protect secondary meaning in the making would amount to affording protection to secondary meaning where none has been shown to exist, or to be on the verge of existing, or to be probable in the future.

A doctrine of protection for secondary meaning in the making was recognized in *National Lampoon, Inc. v. American Broadcasting Cos.,* 376 F.Supp. 733, 747 (S.D.N.Y.), *aff'd* 497 F.2d 1343 (2d Cir. 1974). There the district court said:

Strong evidence of secondary meaning has been presented by plaintiff.... Even assuming secondary meaning has not yet come to full fruition,

---

**26.** The one clear but we believe not critical difference in the parties' relevant activities is that plaintiffs began television advertising, using "Super Glue" earlier. *See* section I *supra.*

**27.** The "3" was adopted by plaintiffs when the contents of the tube were increased from two to three ounces without increasing the retail price.

"A mark with secondary meaning in the making should also be protected, at least against those who appropriate it with knowledge or good reason to know of its potential in that regard, or with an intent to capitalize on its quality. 'Piracy should no more be tolerated in the earlier stages of development of quality than in the latter.' " 3 Callman, Unfair Competition Trademarks and Monopolies, (3d ed. 1971) p. 356. The Court of Appeals affirmed, without discussing the doctrine of secondary meaning in the making, on the single ground that "defendant... had deliberately attempted to exploit [plaintiff's] well-known name and reputation." 497 F.2d at 1343.

Here, in contrast to *National Lampoon*, we are not persuaded that plaintiffs have ever been on the way to establishing secondary meaning. Nor is the term "so distinctive that... [it] will become associated in the public mind as identifying a particular manufacturer who thereby has earned a goodwill right thereto," *PPS, Inc. v. Jewelry Sales Representatives, Inc.*, 392 F.Supp. 375, 383–84 (S.D.N.Y.1975) (footnotes omitted). While they certainly have invested in the term "Super Glue" as part of the name of their product, those investments alone cannot give plaintiffs a right to exclusive use. It is clear that defendants were using the term "Super Glue" prior to plaintiffs' advertising campaigns. Plaintiffs' subsequent expenditures cannot oust the defendants from a usage which was valid when initiated. Plaintiffs, later entrants into the market, saw fit to use a generic or descriptive term, already in currency in the industry, in identifying their product as their own. Doubtless in recognition of the inherent weakness in that identification, they sought to bolster it by coupling "Super Glue" with their housemark "Duro" or with the arbitrary numerical "3" as in "Super Glue 3." Plaintiffs cannot preclude others from the continued use of a term which plaintiffs did not originate, simply by investing large sums of money in advertising of that term.

Moreover, we do not find "piracy" in the case at hand. Since defendants were not second comers to the term and, in fact, used the term well prior to plaintiffs' advertising, defendants cannot be said to have appropriated the term from plaintiffs. Nor do we find that the added prominence given the term "Super Glue" in defendants' later packaging supports the notion that defendants were engaging in "piracy," that is, a wrongful appropriation. Even if defendants were to some extent capitalizing on the added currency or popularity which plaintiffs' use may have given to the term "Super Glue," this would not constitute wrongful appropriation, under the facts of this case. *Cf. American Footwear*, 609 F.2d at 662 (quotation p. 215 *infra*). As we set forth below in section VII, here there was no "bad faith conduct." We are not faced here with competitors' struggle over an extant or incipient secondary meaning, but rather multiple competitors' uses of a descriptive or generic term and a possibly increasing currency of that term through exposure over time to the consuming public.

Since we find there is no secondary meaning in the process of being born, and that there never has been a time when this state of facts existed, there is no occasion here to consider whether to protect a secondary meaning in the making. Moreover, this is not a case in which the lack of secondary meaning or secondary meaning in the making is due to defendants' wrongful acts. Therefore, the doctrine of secondary meaning in the making affords plaintiffs no protection.

V. *Defendants' Claim to Cancel Plaintiffs' Registration of "Super Glue"*

Defendants claim that plaintiffs' registration of "Super Glue" on the Supplemental Register should be cancelled by this Court.[28] Defendants offer two reasons: first, that plaintiffs did not have ex-

---

**28.** Our prior opinion in this matter sets forth the history of defendants' applications to cancel plaintiffs' registration. *See Loctite Corp. v.*

*National Starch and Chemical Corp.*, No. 78–916, at 2–3, 7–10 (S.D.N.Y. July 20, 1979).

clusive use of the term "Super Glue" for the year preceding application to the register and therefore did not meet the requirements for registration; and second, that plaintiffs "knowingly misrepresented to the Trademark Office" on this point in making their application. Defendants' Post-Trial Brief at 7, 127. We need not consider the second of these urged grounds for cancellation, since the record supports the first and such a failure to meet the requirements for registration by itself requires cancellation.[29] Moreover, our conclusion that "Super Glue" had become a generic term by early 1974, and thus prior to plaintiffs' November, 1975, application to the Supplemental Register, mandates the same result.[30]

The Lanham Act states that, "If . . . the registrant was not entitled to register the mark at the time of his application for registration thereof, . . . the registration shall be canceled. . . ." 15 U.S.C. Section 1092. In order for an applicant to have been entitled to a registration on the Supplemental Register, there must have been "lawful use [of the mark] in commerce by the proprietor thereof, upon or in connection with any goods or services for the year preceding the filing of the application. . . ." 15 U.S.C. Section 1091. "Lawful use" has been interpreted to mean exclusive use, see,

e. g. Szyferblatt Optical Machinery Co. v. Universal Shellac & Supply Co., 198 USPQ 115, 119 (T.T.A.B.1978); Bruce Foods Corp. v. B. F. Trappey's Sons, Inc., 192 USPQ 725, 728 (T.T.A.B.1976); Kwik-Kopy Franchise Corp. v. Dimensional Lithographers, Inc., 173 USPQ 378, 381 (T.T.A.B. 1972), with some authority also for a standard of exclusive or substantially exclusive use, see Ajax Hardware Corp. v. Packaging Techniques, Inc., 182 USPQ 559, 561 (C.D.Ca.1974); 4 Callman at 626 n. 58.

Plaintiffs originally applied for the registration of "Super Glue" on the Principal Register in November, 1974. After that application was denied, they amended the application to one for registration on the Supplemental Register. The parties agree that the relevant year of "lawful use" is to be counted backward from November 7, 1975. In other words, it extends from November 7, 1974, to November 6, 1975.[31]

Plaintiffs concede that the identification of goods in the registration is "adhesive cement for use on non-porous surfaces" and they do not dispute that there were uses of the term "Super Glue" on other such adhesives during the critical year. However, plaintiffs petition the Court to amend this identification to "cyanoacrylate adhesive,"[32] and they maintain that within the

---

**29.** Numerous cases have cancelled registrations on the Supplemental Register for failure to meet the requirements for registration; it is not necessary to find fraud. See, e. g., Bruce Foods Corp. v. B. F. Trappey's Sons, Inc., 192 USPQ 725, & n. 3 (T.T.A.B.1976); Kwik-Kopy Franchise Corp. v. Dimensional Lithographers, Inc., 173 USPQ 378 (T.T.A.B.1972).

**30.** Though plaintiffs have not challenged defendants' standing to counterclaim for cancellation, we note that defendants clearly meet the relevant standing requirements, which are set forth at 15 U.S.C. Section 1092, since plaintiffs, in part on the basis of their registration, invoke against defendants the protection of the Lanham Act. In any event, defendants have standing. See D. M. & Antique Import Corp. v. Royal Saxe Corp., 311 F.Supp. 1261, 1268–69 (S.D.N.Y.1969); Cummins Engine Co. v. Continental Motors Corp., 359 F.2d 892, 895 (C.C.P. A.1966); Golden Gate Salami Co. v. Gulf States Paper Corp., 332 F.2d 184, 188 (C.C.P.A.1964).

**31.** Despite the parties' agreement as to the period constituting the critical year, there are

some inconsistencies in their papers as to when plaintiffs' effective application to the Supplemental Register was made. We accept the parties' delineation of the critical year and accordingly regard the effective date of application as being in November of 1975. However, even if it were in November of 1974, it would make no difference to our conclusions, since plaintiffs never had exclusive or substantially exclusive use of "Super Glue."

**32.** In our prior summary judgment opinion, we deferred ruling on defendants' counterclaim for cancellation of plaintiffs' registration on the Supplemental Register, to permit plaintiffs to apply to the Patent and Trademark Office to amend the identification of goods to "cyanoacrylate adhesives." Loctite Corp., 78–916, at 9–10. Plaintiffs' application to the Trademark Office to amend their registration was denied. Plaintiffs then applied to this Court to amend. The March 12, 1981, decision of the Commissioner of the Patent and Trademark Office, ruling that the Trademark Trial and Appeal Board has the authority to consider Loctite's petition

universe of cyanoacrylate adhesives, they had substantially exclusive use of the term "Super Glue" in the critical year.

We find otherwise. Plaintiffs admit relevant use of the term by others, but claim that use was not enough to disturb the conclusion that their use was substantially exclusive. They state,

> The record indicates that the term was used on a cyanoacrylate product by Wilhold Glues, Inc. for a three-month period—August 1975 to November 1975. . . .
>
> There is no proof in the record of the extent of sales during this time frame nor is there any proof of any advertising or promotion that contained the term "Super Glue." . . .
>
> The only other use during the critical year is by defendants' distributor, All American Sales Company.

Plaintiffs' Post-Trial Brief at 191–92 (citations to record omitted). Regarding PI's use of the term during the critical year, plaintiffs say,

> The earliest date established for use of the blister cards [with the terminology "The Super Glue That Sets In Seconds"] is Spring 1975. . . .
>
> However, there is no proof in the record of the extent of sales to consumers of the cards containing "SUPER GLUE" terminology from the Spring of 1975 to November 1975.

*Id.* at 193 (citation to record omitted).

It is clear that plaintiffs did not have exclusive use of the term "Super Glue" on cyanoacrylate adhesives during the critical year. Under the rule of *Szyferblatt, Bruce Foods,* and *Kwik-Kopy,* plaintiffs' supplemental registration, therefore, must be cancelled. However, the Court in *Ajax Hardware,* 182 USPQ at 561, apparently applied a standard of "exclusive or substantially

exclusive use," though stating, "Plaintiff concedes that the Court of Customs and Patent Appeals has consistently construed lawful use to mean exclusive use." (Citation omitted.) *See also* 4 Callmann at 626 & n. 58. The difference between the two standards would not be of moment here, since we find that plaintiffs' use of the term "Super Glue" during the critical year was neither exclusive nor substantially exclusive within the universe of cyanoacrylate adhesives. The cyanoacrylate adhesive industry during the year in question had a limited number of competitors. During this time, PI was one of the top three in the market. PI's public use of the term on their window banner began in 1973. This, and PI's decision to adopt "Super Glue" language on their blister card, were essentially contemporaneous with plaintiffs' display and offering of its product at the Automotive Parts and Accessories Show, and their receipt of the first orders for their product. Also essentially contemporaneous were plaintiffs' first shipment of its cyanoacrylate and defendants' first shipments of blister cards with the new "Super Glue" language. PI made increasing use of the new blister cards thereafter. All of this took place before the critical year even began. As noted above, plaintiffs concede defendants' use of the term "Super Glue" on their product by March of 1975, nearly halfway through the critical year.

Plaintiffs at no relevant time had exclusive use of "Super Glue" with reference to cyanoacrylate adhesives. The contemporaneousness and extent of the term's use by defendants, a major manufacturer, in a field at the time basically limited to three competitors, and on a product identical to plaintiffs', defeats plaintiffs' claim to substantially exclusive use during the critical year.[33]

for amendment and should do so, has no effect on the matter before this Court.

**33.** Although we have made reference to other uses of the term "Super Glue" to consumers, if we limit our consideration to the use of the term on goods involved in sales, we are persuaded that plaintiffs did not have substantially exclusive use. Thus, our disposition of this

matter is unchanged by plaintiffs' objection that only use on goods is relevant, plaintiffs' Post-Trial Brief at 194. *But cf. Kwik-Kopy,* 173 USPQ at 378 (dating petitioner's first use of disputed term from a use in advertising of the service offered, and noting promotion and advertising).

Thus, cancellation of plaintiffs' registration is mandated. The fact that defendants' use of the term (if not generic) was descriptive in no way alters this. *See Kwik-Kopy,* 173 USPQ at 381.

If "Super Glue" is generic and has been so since as early as 1974, as we have held above, then this fact also and independently compels us to cancel plaintiffs' registration. *See Cummins Engine,* 359 F.2d 892. The Lanham Act provides that registration on the Supplemental Register is available only to "marks capable of distinguishing applicant's goods." 15 U.S.C. Section 1091. A generic term by definition is not capable of distinguishing the goods from any particular source. Therefore, "the registrant was not entitled to register the mark at the time of his application," 15 U.S.C. Section 1092, and the registration must be cancelled.

Our cancellation of plaintiffs' supplemental registration because of the use of the term on others' cyanoacrylate adhesives, and additionally because of the generic nature of the term, moots plaintiffs' demand for an order directing the Commissioner of the Patent and Trademark Office to amend the identification of goods on plaintiffs' registration to "cyanoacrylate adhesive."

## VI. *Plaintiffs' Claims for Trademark Infringement*

Because we have ordered cancelled plaintiffs' supplemental registration and because the term "Super Glue" at all relevant times has been generic, plaintiffs have no basis for a statutory claim of trademark infringement. *See CES Publishing Corp. v. St. Regis Publications, Inc.,* 531 F.2d 11, 13 (2d Cir. 1975); 3 Callman at 929. In addition, because of the generic status of "Super Glue," their common law claim for trademark infringement fails as well. *See CES,* 531 F.2d at 13; *Abercrombie,* 537 F.2d at 9–10; *Bayer Co. v. United Drug Co.,* 272 F. 505, 509 (S.D.N.Y.1921).

[N]o matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot

deprive competing manufacturers of the product of the right to call an article by its name.

*Abercrombie,* 537 F.2d at 9 (citations omitted).

Even if "Super Glue" is deemed descriptive, rather than generic, the statutory claim fails because of the cancellation. *Cf. Feathercombs,* 306 F.2d at 257 ("Registration in the supplemental register... entitles the owner of a mark... to obtain the remedies provided in the Lanham Act, 15 U.S.C.A. Sections 1114–1122."); *D C Comics, Inc. v. Powers,* 465 F.Supp. 843, 846 (S.D.N.Y.1978) (since neither party "presently hold[s] a registered trademark in the Daily Planet..., any rights to the exclusive use thereof are to be determined solely under the common law of trademarks"). In addition, both the statutory and common law claims for infringement fail because plaintiffs' use of "Super Glue" is entitled to no protection against infringement in the absence of secondary meaning. *See W. E. Bassett,* 435 F.2d at 661.

## VII. *Plaintiffs' Unfair Competition Claim*

Since our jurisdiction over plaintiffs' unfair competition claim is based both on diversity jurisdiction and on the pendant jurisdiction provisions of 28 U.S.C. Section 1338, the circuit court's holding in *Flexitized, Inc. v. National Flexitized Co.,* 335 F.2d 774, 780–81 (2d Cir. 1964), *cert. denied,* 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965), that state law governs is directly on point. Moreover, as the court in that case found, we find here that under New York conflicts of laws rules, the substantive law which should govern in this case is New York law. *See id.* at 781 n. 3. Defendant Permabond is and has been a New York corporation, its allegedly wrongful acts were or would have been centered in New York, no state has more significant contacts, and neither party suggests that the law of any other state should govern.

Under New York unfair competition law, plaintiffs need not show secondary meaning in the term "Super Glue" in

order to prevail. *See id.* at 781–82. However, the Second Circuit has recently rearticulated the limits of the doctrine of unfair competition.

Although at one time the law of unfair competition was limited to claims that one party had attempted to pass off his goods as those of another party, unfair competition is now held to encompass a broader range of unfair practices which may be generally described as a misappropriation of the skill, expenditures, and labor of another.... " [O]ne cannot sell his product by misappropriating the goodwill of another through misleading the public into thinking that it is 'sponsored' by or derived from something else." ... Yet, liability in this area for misimpression or misappropriation has been limited. For example, one can capitalize on a market or fad created by another provided that it is not accomplished by confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor.... All the cases in this area which appellants rely upon involved proof of a substantial secondary meaning in plaintiff's arbitrary trademark, ... or bad faith predatory conduct justifying relief.... [W]hile American certainly intended to capitalize on Universal's popularization of the word "bionic," we find that it did not so capitalize by confusing consumers.

*American Footwear*, 609 F.2d at 662 (citations omitted). Here we find that there was no "bad faith predatory conduct justifying relief," *id.* The evidence does not support the contention that defendants attempted to misappropriate plaintiffs' goodwill or mislead the public into believing defendants' product was plaintiffs' or had some relationship with plaintiffs' other than that of being competitive. Defendants were not second comers to use of "Super Glue" in sales on their product. Moreover, defendants' first use of the term preceded any substantial use of the term by plaintiffs and occurred substantially before plaintiffs began to advertise their "Super Glue" product, at a time when there was nothing to misappropriate. *Cf. Flexitized*, 335 F.2d at

780–83 (misappropriation of "something of plaintiffs"). Nor was there ever anything of plaintiffs' to be misappropriated by others' use of the term "Super Glue," since the term is not distinctive, has at all times been used by plaintiffs' competitors in the field, and plaintiffs were not the first users of the term. Certainly, if "Super Glue" has been generic, there can be nothing of plaintiffs' to be misappropriated in the term.

If defendants capitalized to some extent upon plaintiffs' contribution to the currency of the term "Super Glue" as a generic or descriptive term in defendants' initial adoption of "Super Glue" language or later shortening of the name of their product to "Permabond Super Glue," then, as in *American Footwear*, they "did not so capitalize by confusing customers," 609 F.2d at 662. Evidentiary findings which persuaded the *American Footwear* court of this conclusion are apposite here:

[T]he district court found that there was no proof that American's advertising was built thematically around Universal's television shows, or that American played down its own name to inspire confusion, or that American acted in any way except by the use of the word "bionic" to suggest any association with Universal's television enterprise. In fact, appellants concede that Universal's merchandising program uses the term "bionic" to *describe* many products sold under "The Six Million Dollar Man" mark and the "Bionic Woman" mark; therefore, in view of this descriptive usage there would be no apparent reason for a consumer to assume that because the boots bore the mark "Bionic" the creators of "The Six Million Dollar Man" or the "Bionic Woman" were automatically engaging their creations in the sponsorship of hiking boots. Additionally, there was no evidence of prior dealings between American and Universal... which might tend to support a conclusion that American adopted "Bionic" for the purpose of suggesting an association with Universal's television series.

609 F.2d at 662 (Citations omitted).

As in *American Footwear*, the only real issue here concerns use of the term "Super

Glue." The term as used by both parties in the names of their products is generic or descriptive, so that there is no reason for a prospective consumer to believe defendants' product is associated with plaintiffs, and there is no reason to suppose that defendants were endeavoring to suggest an association with plaintiffs' product.

Plaintiffs' unfair competition claim accordingly fails.

### VIII. *Plaintiffs' False Designation Claim*

Plaintiffs have claimed a violation of 15 U.S.C. Section 1125(a), which provides as follows:

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

The thrust of plaintiffs' allegations with respect to this claim, is that defendants' use of the term "Super Glue" on its product is likely to make prospective purchasers "believe erroneously that defendant Permabond's cyanoacrylate adhesive is either manufactured or sponsored by plaintiffs or is being placed upon the market with the consent or authority of plaintiffs." Joint Pre-Trial Order at 25.

■■■■ Liability may exist under this section in the absence of a registered trademark, *see Gilliam v. American Broadcasting*

*Cos.*, 538 F.2d 14, 24 (2d Cir. 1976), and liability has been found even in the absence of any form of trademark, *see Glenn v. Advertising Publications, Inc.*, 251 F.Supp. 889, 902 (S.D.N.Y.1966); *Ames Publishing Co. v. Walker-Davis Publications, Inc.*, 372 F.Supp. 1, 11 (E.D.Pa.1974). However, there must be some representation which has a tendency to describe or represent goods falsely, whether the representation is literally true or not. *See generally, American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir. 1978); *Gilliam*, 538 F.2d at 24. Plaintiffs maintain that the tendency to falseness in this case, has adhered solely in the indication of origin.

■■■■ However, we find no such representation with a tendency to falseness here. "Super Glue" is a generic, or at least a descriptive term and it lacks secondary meaning in plaintiffs' favor. A finding of no secondary meaning means that the term does not indicate the origin of the product. Thus, defendants' use of the term cannot misleadingly suggest the product originated with plaintiff. Moreover, such use did not suggest any association with plaintiff. Defendants are using a term which is generic or descriptive, non-distinctive and not original with plaintiffs, and which thus has been found to have no particular association with plaintiffs as a product source. Its use is open to all. *See CES*, 401 F.Supp. 424, *aff'd with instructions to dismiss*, 531 F.2d 11; *Nature's Bounty, Inc. v. Basic Organics*, 432 F.Supp. 546, 553 (E.D.N.Y.1977).

Moreover, quite apart from the secondary meaning issue, defendants have never used the term "Super Glue" alone or even as a first word on their goods, but always with another identifier, "Permabond." On the earlier blister cards, there are even further distinguishing features in the form of the additional parts of the phrase in which "Super Glue" is embedded. This weighs against any finding of a tendency to falsely represent origin or association with plaintiffs.

This is not a case in which defendants were second comers to the term "Super Glue," and were trying to exploit plaintiffs' reputation by causing confusion among prospective consumers. Either defendants were first comers to the term or the parties' adoption of it was essentially simultaneous. At the time defendants adopted the term, plaintiffs had not yet begun their advertisement of it or even announced their television advertising campaign. There would have been no advantage to be gained by causing consumers to believe that defendants' product was produced by or associated with plaintiffs, as plaintiffs allege. Moreover, although plaintiffs have endeavored to show a deliberate attempt by defendants to cause confusion and exploit plaintiffs' reputation, we find none, though violation of Section 1125(a) "does not require proof of intent to deceive," *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir. 1980). The testimony offered by plaintiffs to show there was a meeting of defendants and those associated with them at which such a course of action was adopted, is not credible. The time at which this meeting is supposed to have taken place predates plaintiffs' advertisement of its product, and *see* sections I, III G *supra*.

While plaintiffs have offered some evidence of consumer confusion, we do not find defendants responsible for any such confusion, since: we do not find them to have been second comers to the term; we have concluded that "Super Glue" is generic or descriptive without secondary meaning; and we find that at the time defendants adopted the term "Super Glue," they used it with more additional distinguishing terms than were ever used by plaintiffs.

Moreover, if we concentrate not on defendants' initial adoption of the term "Super Glue," but rather on the subsequent shortening of the name of their product in which they dropped the "The Super Glue That Sets In Seconds" language for "Permabond Super Glue," we still find no violation of Section 1125(a). Although plaintiffs had begun advertisement of their product by the time this alteration occurred, and defendants' shortening of the name on their product brings that name closer to plaintiffs', several factors persuade us there was no violation. Defendants retained a distinguishing feature, "Permabond." Moreover, this is the feature which they had already established as the distinguishing part of their name before the change, and in general, the change did not represent the adoption of a new name but the continuation with modification of an old one, *see also* section X *infra*.

Finally, because "Super Glue" was a generic or at least a descriptive term without secondary meaning, a term which was not distinctive, one which did not originate with plaintiffs, and as to which defendants were in fact first comers or essentially contemporaneous comers with plaintiffs, its use was open to defendants. As we have already noted, if plaintiffs' extensive and expensive exploitation of "Super Glue" created an incentive to increased utilization or emphasis of the term, this is simply a risk that a manufacturer invites when it spends money to exploit a term to which it does not have proprietary rights, *see* section VII *supra*, *citing American Footwear*, 609 F.2d at 662.

## IX. *Plaintiffs' Section 368-d Claim*

Plaintiffs claim also under N.Y.Gen. Bus.Law Section 368-d (McKinney), which provides that,

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

The leading New York case interpreting Section 368-d entirely disposes of plaintiffs' claim. In *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 369 N.E.2d 1162, 399 N.Y.S.2d 628, 632-33 (1977), the Court of Appeals held that,

Although section 368-d does not require a showing of confusion or competi-

tion to obtain an injunction, it does require a "[l]ikelihood of injury to business reputation or of dilution of the *distinctive quality* of a mark or trade name." (Emphasis added.) The statute prohibits any use of a name or mark likely to dilute the *distinctive quality* of a name in use. To merit protection, the plaintiff must possess a strong mark—one which has a distinctive quality or has acquired a secondary meaning which is capable of dilution. Courts interpreting Massachusetts' anti-dilution statute—applying its terms literally—have required a showing that the trade-mark or name to be protected is either unique or has acquired a secondary meaning before issuing an injunction. . . .

. . . .

In sum, although section 368–d should be interpreted literally to effectuate its intended purpose—protection against dilution—only those trade names which are truly of *distinctive* quality or which have acquired a secondary meaning in the mind of the public should be entitled to protection under the anti-dilution statute. "Allied Maintenance" cannot be said to have attained this stature.

(Citations omitted.)

█ We have concluded above that "Super Glue" has no secondary meaning. It is also not a distinctive name for plaintiffs' product. A generic term is the antithesis of a distinctive one. Even if "Super Glue" is considered to be a descriptive, rather than a generic term, it has been used, as discussed above, by a number of companies marketing separate cyanoacrylate and related non-cyanoacrylate products during the entire course of plaintiffs' use of the term, as well as before such time. Under these circumstances, the term has no distinctiveness with reference to plaintiffs' product. Plaintiffs' Section 368–d claim fails.

X. *Plaintiffs' Claim to Cancel Defendants' Registration*

Plaintiffs petition the Court to cancel defendants' Registration No. 876,820 on the Principal Register of a mark consisting of a background letter "H" within which appears the word "*Perma-bond*" and beneath that word, in smaller type, the words "Super Strength Glue," with the last three words disclaimed, apart from the mark. As we noted above, defendants acquired this mark from an unrelated company in 1969. The basis for plaintiffs' petition is their claim that defendants have abandoned the mark, *see* 15 U.S.C. Section 1127. Defendants deny abandonment and challenge plaintiffs' standing to bring this claim.

Plaintiffs appear to bring this claim as a make-weight. Its disposition neither affects nor is affected by any other portion of this lawsuit. The matter is resolved by our conclusion that defendants have not abandoned their mark.

█ Abandonment under 15 U.S.C. Section 1127, requires both "non-use and intent not to resume use." *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir. 1980). We find neither present here. *Cf. Puritan Sportswear Corp. v. Shure*, 307 F.Supp. 377, 389 (W.D.Pa.1969) (use alone of "Puritan" does not constitute abandonment of the registered trademark "Puritan Sportswear, the Choice of All Americans"); *American Security Bank v. American Security and Trust Co.*, 571 F.2d 564, 567 (C.C.P.A.1978) (change from "AMERICAN SECURITY" to "AMERICAN SECURITY BANK" is not the creation of a new mark where "bank" is purely descriptive and adds nothing to the origin-indicating significance of "AMERICAN SECURITY"; issue being the right to register). "[T]he new and old forms [of the mark] create the same, continuing commercial impression," *Ilco Corp. v. Ideal Security Hardware Corp.*, 527 F.2d 1221, 1224 (C.C.P.A.1976), and "there appears to be a continuous intent to have the mark . . . identify [their] goods," *Proxite Products, Inc. v. Bonnie Brite Products Corp.*, 206 F.Supp. 511, 514 (S.D.N.Y.1962).

█ It is only the first version of the mark, that is, "Permabond Adhesive Power," that adds words not found in the registered mark. Even if this addition of words was found to modify the commercial im-

pression conveyed by the mark (though we do not so find) so that there was non-use of the registered mark for several years, giving rise to a rebuttable presumption of abandonment, *see Saratoga Vichy*, 625 F.2d at 1044, the fact is that the "Permabond Adhesive Power" version of defendants' mark was followed by two subsequent versions which create the same commercial impression as the registered mark. "The continued use of [the] trademark... [is] of such quality as to protect the goodwill for which it was originally adopted." *Anvil Brand, Inc. v. Consolidated Foods Corp.*, 464 F.Supp. 474, 481 (S.D.N.Y.1978). There is no intent to abandon here, and defendants have not abandoned their mark.[34]

### XI. *Defendants' Claim of Unfair Competition by Plaintiffs*

Defendants' counterclaim of unfair competition is based on communications issued by plaintiffs, including an allegedly deceptive communication by plaintiffs to the trade concerning this Court's July 20, 1979, summary judgment decision. Pursuant to the Court's instructions, defendants refrained from briefing this issue in their post-trial brief. *See* Defendants' Post-Trial Brief at 128. Plaintiffs, however, have already briefed the issue. *See* Plaintiffs' Post-Trial Brief at 292–301. Accordingly, defendants, if they wish to pursue this claim, are directed to submit their brief on this counterclaim within fifteen (15) days of their receipt of this decision.

### XII. *Conclusion*

Plaintiffs' claims are denied.[35]

Defendants' counterclaim to cancel plaintiffs' registration of "Super Glue" on the Supplemental Register is granted. The Commissioner is directed to cancel U.S. Trademark Registration No. 1,030,393 on the Supplemental Register.

Consideration of defendants' counterclaim of unfair competition is deferred pending the Court's receipt of defendants' brief within fifteen (15) days from receipt of this opinion, as set forth above.

---

**34.** Moreover, defendants recite, and plaintiffs do not controvert, that "[t]he Trademark Office has... accept[ed], as specimens accompanying a [Section] 8 affidavit of continued use of the mark of the registration, industrial market labels which bear only the word 'Permabond'...," Defendants' Post-Trial Brief at 121.

**35.** Because of our disposition of the claims in this case, we have not found it necessary to rule on defendants' fair use defense.