**MERRITT FORBES & COMPANY INCORPORATED, Plaintiff,**

v.

**NEWMAN INVESTMENT SECURITIES, INCORPORATED; Newman and Associates, Inc.; Security Pacific National Bank; and Security Pacific Corporation, Defendants.**

No. 84 Civ. 4618 (RWS).

United States District Court,
S.D. New York.

Feb. 20, 1985.

Saterlee & Stephens by James F. Rittinger, New York City, Saidman, Sterne, Kessler & Goldstein, Washington, D.C., for plaintiff; Edward J. Kessler, Robert W. Sacoff, Washington, D.C., of counsel.

O'Melveny & Myers, New York City, for defendants; Sally A. Treweek, Astrid R. Baumgardner, Lani A. Adler, New York City, of counsel.

## OPINION

SWEET, District Judge.

Plaintiff Merritt Forbes & Co. ("Merritt Forbes") has brought this action alleging copyright infringement under 17 U.S.C. § 501 *et seq.*, false designation of origin under 15 U.S.C. § 1125(a), common law service mark infringement and unfair competition, and misappropriation. Defendants Newman Investment Securities, Inc., Newman and Associates, Inc., Security Pacific National Bank and Security Pacific Corporation (collectively "Newman") now move to dismiss the complaint under Rule 12(b)(6) and for summary judgment. Skilled counsel have ably presented this unique issue in which protection is sought for certain bond offering documents. On the facts and conclusions set forth below, the motions are granted in part and denied in part.

*Facts*

The following facts are not in dispute except where noted. Merritt Forbes and Newman underwrite and market various types of securities, including tax-exempt municipal bonds ("bonds"). Bonds are offered to investors by means of disclosure documents, which may be styled as official statements, offering memoranda, "offering circulars" or "reoffering circulars" ("bond underwriting documents"). These documents describe the product, the issuer, and the underwriter and are intended to disclose all facts material to an investor's decision to purchase the bonds.

Between 1981 and 1983 Merritt Forbes developed a municipal bond program involving long-term tax-exempt bonds to which an option is attached giving the bond holder the option to "put" or "tender" the bond back to the seller prior to its stated maturity. According to Newman, similar bonds had previously been offered by several securities firms underwriting municipal issues. Merritt Forbes contends, however, that its bond program was unlike any other known to the bond market at that time because of a combination of unique features.

Merritt Forbes' program, which it referred to as its Tender Option Program, was described and outlined in three principal documents: the Secondary Reoffering Circular and its associated Supplement, the "Executive Summary of Tender Option Program" (the "Executive Summary"), and the "Presentation to [Name of institution] regarding the TENDER OPTION PROGRAM for the Sale of Below Market Tax-Exempt Securities Portfolios" (the "Presentation Package"). The Secondary Reoffering Circular and its Supplement was publicly distributed without qualification to broker/dealers, institutional investors, and potential seller institutions.

Starting in the fall of 1983, Merritt Forbes employees began to contact major financial institutions that were known to have substantial portfolios of long-term municipal bonds to determine their interest in the program. Those institutions which exhibited an interest in the program were usually sent the Executive Summary upon the approval of an authorized person at Merritt Forbes and, if further interest was shown, were thereafter sent the Presentation Package. According to Merritt Forbes, the Executive Summary and Presentation Package were given to institutions with oral and written understanding that the information therein would be held in confidence.

Between October and December 1983 Merritt Forbes began using the trade identity designations TOP's[sm], TENDER OPTION[sm], and TENDER OPTION PRO-

GRAM[sm] (collectively, "the Marks") to identify the services offered in connection with its new program. All secondary reoffering circulars published by Merritt Forbes in conjunction with this program stated "TOP's, TENDER OPTION, and TENDER OPTION PROGRAM are service marks of Merritt Forbes & Company Incorporated." On May 30, 1984, Merritt Forbes filed application with the United States Patent and Trademark Office to secure Federal Service Mark Registrations for each of these marks.

On May 30, 1984 Merritt Forbes also registered a copyright in two Secondary Reoffering Circulars dated February 1 and March 1, 1984 and two associated Supplements dated February 13 and March 1, 1984 ("copyrighted material") circulated in conjunction with the bond transactions offered to the public in February and March of 1984 and received a certificate of copyright registration. The copyrighted material was originally published without notice of copyright.

At some point between December of 1983 and late February of 1984 Merritt Forbes allegedly held telephone discussions with Dudley E. Stewart, ("Stewart"), and Joseph Irwin, ("Irwin"), both officials of Security Pacific Bank, and Pat Woosley ("Woosley") and Jeff Dorfman ("Dorfman"), employees of the Bank, about Merritt Forbes' Tender Option Program. Following these conversations, Merritt Forbes allegedly sent Irwin an Executive Summary and in mid-February 1984 sent Irwin a Presentation Package. According to Merritt Forbes, Security Pacific agreed to keep information about the program confidential. Irwin has no recollection of having requested or received the Executive Summary, although he received a copy of the Presentation Package. According to Irwin, the Presentation Package was only distributed to two members of Security Pacific's legal department and no one else.

On April 5, 1984 Newman Investment Securities, Inc. served as underwriter and Newman and Associates Inc. served as marketing agent in a transaction offered to

the public on April 5, 1984 by means of Newman's reoffering circular and supplement. ("Newman's offering documents"). The bonds in Newman's transaction were supported by a letter of credit from Security Pacific National Bank. Newman's securities were called "tender option securities."

*Prior Proceedings*

In June 1984 Merritt Forbes initiated this suit alleging copyright infringement, unfair competition, service mark infringement, and misappropriation of proprietary information in connection with the Newman offering. In its complaint, Merritt Forbes claims first that Newman's Offering Documents were substantially copied from Merritt Forbes' copyrighted works and therefore infringe Merritt Forbes' copyright. In addition, Merritt Forbes alleges that Newman made unauthorized use of the service marks adopted and used by Merritt Forbes and that this use constitutes both a violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and common law service mark infringement and unfair competition in violation of the laws of New York. Merritt Forbes also claims that Security Pacific and Newman conspired to violate Merritt Forbes' rights by misappropriating the confidential information supplied by Merritt Forbes to Security Pacific in Merritt Forbes' Executive Summary and Presentation Package.

In its motion, Newman contends, first, that the copyright infringement claim must be dismissed because Merritt Forbes does not have a valid copyright in its bond documents; second, that Merritt Forbes' claims of false designation of origin, service mark infringement, and unfair competition must be dismissed because the term "tender option" is generic; and, third, that Merritt Forbes misappropriation claim must be dismissed because there is no showing that Newman made use of Merritt Forbes' disclosures.

*Copyright Infringement*

In order to establish an actionable claim for copyright infringement, a plaintiff bears the burden of establishing both ownership of a valid copyright and actual copying by the defendant. *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 499 (2d Cir.1982). A copyright registration certificate constitutes prima facie evidence of the validity of the copyright, 17 U.S.C. § 410(c), but validity will not be assumed where other evidence in the record casts doubt on the validity of the copyright. *Shapiro & Son Bedspread Corp. v. Royal Mills Associates*, 568 F.Supp. 972, 975 (S.D. N.Y.1983). Two of the elements that are necessary for ownership of a valid copyright are copyrightability of the subject matter and originality in the author. 3 Nimmer on Copyright, § 13.01[A] (1984). Newman challenges Merritt Forbes' claim of a valid copyright on the grounds that as a matter of law Merritt Forbes is unable to establish either of these elements with respect to its copyrighted documents.

*Subject Matter of Copyright and Fair Use*

Section 102 of the Copyright Act of 1976, 17 U.S.C. § 102, confers copyright protection "in original works of authorship fixed in any tangible medium of expression." The Act lists seven broad categories included within the concept of "works of authorship," a list which is intended to be "illustrative and not limitative" and provide "sufficient flexibility to free the courts from rigid or outmoded concepts of the scope of particular categories." House Report on the Copyright Act of 1976, Report No. 94–1476, p. 53 ("House Report"), U.S. Code Cong. & Admin.News 1976, 5659, 5666. Included in that list is the category of "literary works," a term which "does not connote any criterion of literary merit or qualitative value. It includes catalogs, directories, and similar factual, reference, or instructional works and compilations of data." House Report, p. 54. Given the breadth of the classification, Merritt Forbes' bond documents qualify as copyrightable "literary works," given their similarity in form to other works held to have been so qualified. *See Financial Information, Inc. v. Moody's Investors Service, Inc.*, 751 F.2d 501 (2d Cir.1984) (daily bond

reports); *H.C. Wainwright & Co. v. Wall Street Transcript Corp.,* 418 F.Supp. 620 (S.D.N.Y.1976), *aff'd,* 558 F.2d 91 (2d Cir. 1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978) (financial research reports); *Harcourt, Brace & World, Inc. v. Graphic Controls,* 329 F.Supp. 517 (S.D.N.Y.1971) (answer sheets for examinations).

■■■ However, copyright may be claimed only in the "expression" of a work of authorship, not in its "idea." Nimmer on Copyright, § 2.03[0] (1984); *Reyher v. Children's Television Workshop,* 387 F.Supp. 869 (S.D.N.Y.1975), *aff'd,* 533 F.2d 87 (2d Cir.1976). Section 102(b) of the Act provides that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated or embodied in such a work." Thus, infringement will not be found where the only similarity between two works is that of an abstract idea, rather than a particular method or means of expressing that idea. *Eckes v. Card Prices Update,* 736 F.2d 859, 862 (2d Cir.1984); *Durham Industries v. Tomy Corp.,* 630 F.2d 905, 912–13 (2d Cir. 1980); *A.A. Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 978 (2d Cir. 1980).

■■ Within the above confines, any original expression qualifies as an appropriate subject for copyright protection, although the degree to which an actionable infringement will be found may depend on the actual nature of the work. Newman argues, however, that industry convention and public policy require a conclusion that bond underwriting documents are not a proper subject for copyright protection. In support of this proposition, Newman offers the affidavits of two persons knowledgeable in the bond industry that set forth how bond documents are generated and why copyrighting such documents is implausible. They claim that bond documents are generated by marking up precedents from earlier transactions, the persons in the bond industry frequently communicate information among themselves, and that bond documents follow similar form and contain similar language by virtue of legal disclosure requirements, use of boilerplate and standardized language, and industry consensus. They further argue that because standard bond documents can easily be adapted to new concepts, this procedure is followed even with "new" products.

According to Newman, this standardization of bond underwriting documents permits investors to focus on the substantive differences between transactions so that they can meaningfully compare and evaluate different investments. In addition, Newman claims that the industry custom of relying on precedent decreases the cost of bond offerings and thus increases the ability of municipalities to raise funds efficiently and the range of investment opportunities available to the public. Newman argues that if Merritt Forbes were permitted to enforce its copyright with respect to its bond underwriting documents, all other persons wishing to engage in similar bond transactions would be precluded from doing so and that therefore both the vigorous competition in and efficient operation of the bond market would be threatened.

■■ The issue of whether or not bond underwriting documents are the proper subject for copyright protection has apparently never been addressed in this or any other jurisdiction. As noted above, documents of a somewhat similar nature have been considered copyrightable, and the leading copyright commentator notes that "[t]here appear to be no valid grounds why legal forms such as contracts, insurance policies, pleadings and other legal documents should not be protected under the law of copyright." 1 Nimmer on Copyright, § 2.18(E). Newman claims, however, that courts in this Circuit have dismissed copyright infringement actions after considering the nature of the particular materials and the policy implications of protecting such materials under the copyright laws, and cites *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 973, 977 (2d

Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980) (historical works) and *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir.1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967) (biographies) in support of this proposition. In neither of these cases did a court grant summary judgment on the grounds that public policy considerations mandated refusing copyright protection to an otherwise copyrightable category of works. In *Hoehling*, the Court rejected the argument that historical interpretation deserved copyright protection, a conclusion consistent with the general principle that "[a]n interpretation of fact is itself a fact, or purported fact, deduced from other facts." 1 Nimmer on Copyright, § 2.11[A]; *see also Financial Information, Inc. v. Moody's Investors Service, Inc., supra*, at 504–505; *Harper & Row Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 205 (2d Cir. 1983). In *Rosemont* the issue before the Court involved the applicability of the fair use doctrine as a defense in a copyright infringement case rather than the validity of the copyright in question.

Both cases, however, provide some general support for the proposition that public policy considerations may affect the degree to which the copyright on a particular type of work may be infringed. The Court in *Hoehling* noted that because "the cause of knowledge is best served when history is the common property of all ... the scope of copyright in historical accounts is narrow indeed, embracing no more than the author's original expression of particular facts and theories already in the public domain." 618 F.2d at 974. In *Rosemont*, the Second Circuit overturned the lower court's grant of a preliminary injunction on the ground that the defendant might well be entitled to the defense of fair use despite the fact that a substantial portion of his biography of Howard Hughes was closely copied from a series of articles by the plaintiff. The Court based its decision on its desire to insure that the public not be "deprived of an opportunity to become acquainted with the life of a person endowed with extraordinary talents.... 'Everyone will agree that at some point the public interest in obtaining information becomes dominant over the individuals desire for privacy.' Thus, in balancing the equities at this time in our opinion the public interest should prevail over the possible damage to the copyright owner." 366 F.2d at 309. Based on the specific facts of the case, including the nature of the work and the type of alleged infringement, the Court concluded that the defendant might be entitled to rely on the defense of fair use and reversed the grant of a preliminary injunction.

Thus, while no authority has been cited for the proposition that certain types of works may be exempted from the statutory definition of material subject to copyright because of public policy, the cases cited above suggest that courts may base their decision as to what constitutes unjustifiable infringement of a validly copyright work on considerations of policy. If the *Rosemont* case were read as holding that a court could dictate that the fair use doctrine always provided a defense in infringement cases involving a specific category of works, the end result would, of course, be the same as a holding that exempted that category of material from copyright protection. The *Rosemont* case has been sharply criticized by the leading commentator in the field of copyright for its suggestion that copying of original expression, not essential to the expression of the unprotected underlying idea, might be appropriate in certain situations, *see* 1 Nimmer on Copyright, § 1.10[0]. However, *Rosemont* did not hold that in the future any verbatim copying from biographies would be considered acceptable because of the particular nature of such works, but rather that in the particular situation before the court the balance of equities might support such copying and therefore the preliminary injunction barring dissemination of the work should not have been granted.

While *Rosemont* does not constitute a precedent which would allow this court to hold all bond documents *per se* uncopy-

rightable as a matter of public policy, it does support the conclusion that the specific infringement, if any, by Newman might be justified given the particular nature of the document and of the alleged infringement. *But see Sony Corporation of America v. Universal City Studios*, 464 U.S. 417, 104 S.Ct. 774, 793, 78 L.Ed.2d 574 (1984) (commercial use of copyrighted material is presumptively unfair use). However, the issue of whether Newman has a valid defense, whether based on public policy or other grounds, for any infringement is not yet before this court, as Newman's summary judgment motion focused solely on the threshold question of whether Merritt Forbes is entitled to a valid copyright. The analysis which must be undertaken to determine if a defendant is entitled to the defense of fair use is very different than the one undertaken to decide if material is copyrightable. *See Sony Corporation of America v. Universal City Studios, supra*, 104 S.Ct. at 792. The proof Newman might offer in support of an argument that any infringement of Merritt Forbes' documents was justified as fair use because of public policy considerations and based upon fair use might well be the same as the proof offered in support of this motion. However, because Merritt Forbes' response to Newman's motion focused only on the issue of *per se* copyrightability, any determination of the validity of Merritt Forbes' alleged specific infringement must await the presention of that specific issue to this court, no court having concluded that there is a public policy exemption for a particular classification of literary works which would otherwise be subject to copyright protection.

*Originality and Functional Expression*

■■■■ Newman also contests the validity of Merritt Forbes' copyright on the grounds that the requisite originality is missing. Copyright protection under the Act is accorded only to *"original* works of authorship"*, 17 U.S.C. § 102(a) (emphasis added). The originality necessary to support a copyright constitutes only independent creation, not novelty, since "a work is original and may command copyright pro-

tection even if it is completely identical with a prior work provided it was not copied from such prior work but is rather a product of the independent efforts of its author." 1 Nimmer on Copyright, § 2.01[A]; *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090 (2d Cir. 1977). All that is needed for a finding of sufficient originality is a "distinguishable variation" that is not merely trivial, even if the copyrighted work is based on prior copyrighted or public domain works. *Midway Mfg. Co. v. Bandai-America, Inc.*, 546 F.Supp. 125, 151 (D.N.J.1982); *Durham Industries v. Tomy Corp., supra*, 630 F.2d at 910. 1 Nimmer § 3.03. In such a case, however, only new elements are protected by copyright. Originality may also be found in the selection and ordering of particular facts or elements. *See Financial Information, Inc. v. Moody's Investors Service, Inc., supra*, at 505; *Eckes v. Card Prices Update, supra*, 736 F.2d 859 (2d Cir.1984); *Roy Export Co. Estab. v. CBS, Inc.*, 503 F.Supp. 1137 (S.D.N.Y.1980), *aff'd*, 672 F.2d 1095 (2d Cir.1982).

■■■■ Where a particular form of expression is dictated solely by functional considerations, the requisite originality may be missing. *See, e.g., Kitchens of Sara Lee, Inc. v. Nifty Foods Corporation*, 266 F.2d 541, 544 (2d Cir.1959) (list of ingredients on labels of food products). Similarly, where an underlying idea may only be conveyed in a more or less stereotyped manner, duplication of that form of expression does not constitute infringement, even if there is word for word copying. *Consumers Union of United States, Inc. v. Hobart Mfg. Co.*, 199 F.Supp. 860 (S.D.N.Y.1961); *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738 (9th Cir.1971). *But see* 3 Nimmer on Copyright § 2.18(c)(2) ("[I]t is factually erroneous to conclude that there is any system or method which can be performed by the use of only one particular form of written expression."); *Sid & Marty Krofft Television Prods., Inc. v. McDonalds Corp.*, 562 F.2d 1157 (9th Cir.1977) (where idea and expression are indistinguishable, work may be

protected as against identical copying only.)

Newman argues that given the nature of the bond market, no bond transaction document can ever be sufficiently original to support a finding of a valid copyright. It then contends that in any event Merritt Forbes' specific documents lack originality. In its motion papers, Newman suggests that as in all bond documents most of Merritt Forbes' documents are composed of boilerplate and information required by disclosure laws. It also raises the suggestion that allowing Merritt Forbes a copyright would give it a monopoly on the idea behind the bond offering, because the program or concept can only be expressed in a very limited number of ways. In support of these arguments, Newman presents affidavits stating that the nature of the bond market necessarily requires documents to be cumulative and based on precedent and therefore unoriginal. It offers no specific evidence of earlier documents or sources upon which the various documents in question were allegedly based, nor does it analyze the documents of both parties in detail to support its allegations that the underlying concept is capable of limited expression.

In response, Merritt Forbes has submitted an affidavit by the author of the documents in which he states: "Since the TOP's^sm program was a unique program having no close counterparts among other securities offering programs, I could not rely on precedents developed in other programs, as is often the case in the securities marketing business. Therefore, much of the work for the TOP's^sm program is original to this program...." Horowitz Affidavit, ¶ 5. In addition, Merritt Forbes has submitted an affidavit by a vice president and director of Merritt Forbes in which he states that the particularly original aspect of the TOP's program is its overall combination of a variety of features. Kolodner Affidavit, ¶ 6.

Newman claims that Merritt Forbes has failed to raise any triable issues of fact because its sworn statements are too am-

biguous and inconclusive to support a conclusion that bond offering documents can be original, in particular because Merritt Forbes itself suggests that many such documents are based on precedent.

In a motion for summary judgment, the court must give full weight to the non-moving party's evidence and draw every reasonable inference in its favor. *Ambook Enterprises v. Time, Inc.,* 612 F.2d 604 (2d Cir.1979). Merritt Forbes' contentions that its documents were developed without reliance on precedents and that "much of the work" was original raise a genuine issue of material fact as to the originality of the expression of its program as well as the idea behind it, despite Newman's claim, which may well turn out to be accurate, that no bond documents which comply with the legal requirements can be original and are merely an expression resulting from function.

While the evidence presented by Merritt Forbes may not be detailed, once Merritt Forbes introduced a properly registered certificate, the burden necessarily shifted to Newman to prove that the documents were not original. *Blazon, Inc. v. DeLuxe Game Corp.,* 268 F.Supp. 416 (S.D. N.Y.1965). Newman's contentions, absent a more detailed analysis, are not sufficient to overcome its burden. In any event, "[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." Notes of Advisory Committee on Rules, 28 U.S.C.A. Rule 56 (1963 amendment). The question of whether or not the concept expressed in Merritt Forbes' document is capable of varied expression similarly raises a threshold issue of fact. The view of the court in *Higgins v. Baker* applies here:

The Court has considered the extensive affidavits submitted by defendants, and is impressed with the arguments presented therein. However, these affidavits remain untested. That is, whether the allegedly copied passages could only be expressed in a narrowly circumscribed

manner will best be determined at trial after testimony is given and subjected to the rigorous scrutiny of cross-examination. Affidavits are obviously incapable of similarly thorough testing and inspection and, therefore, should not be dispositive of central issues of fact.

309 F.Supp. 635, 640 (S.D.N.Y.1969). Because genuine issues of material fact are presented as to the originality of Merritt Forbes' work, summary judgment is inappropriate.

*Section 43(a) of the Lanham Act*

In its complaint, Merritt Forbes charges that Newman has used Merritt Forbes' alleged service marks "tender option," "tender option program" and "TOP's" in connection with Newman's own services to connote a false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982) ("Lanham Act"). Asserting that it never used the terms "TOP's" or "tender option program", Newman focuses exclusively on the term "tender option" in its papers. Merritt Forbes, however, asserts that the phrase "TOP's" was verbally used in connection with Newman's program. The three marks will be dealt with separately for purposes of this motion.

Section 43(a) of the Lanham Act provides in pertinent part:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

The term "service mark" is defined as a "mark used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others." 15 U.S.C. § 1127.

A claim for false designation of origin requires a showing of a representation which has a tendency to describe or represent falsely the origin of the product. *Loctite Corp. v. National Starch & Chemical Corp.*, 516 F.Supp. 190, 216 (S.D.N.Y. 1981). However, no claim for false designation of origin can be stated unless the mark in issue is sufficiently distinctive to merit protection against appropriation or imitation.

Thus, the threshold inquiry in a false designation of origin claim is whether the mark at issue is protected, and if so, to what degree. *See Eli Lilly & Co. v. Revlon, Inc.*, 577 F.Supp. 477, 482 (S.D.N.Y. 1983); *E.R. Squibb & Sons, Inc. v. Cooper Laboratories, Inc.*, 536 F.Supp. 523, 527 (S.D.N.Y.1982). The scope of protection afforded the mark is determined by which of four categories of terms it falls into. In ascending order of strength, these are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Ambercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir.1976), *McGregor-Doniger Inc. v. Drizzle, Inc.*, 599 F.2d 1126 (2d Cir.1979). A generic term can never become a valid trademark and cannot be registered. *Abercrombie & Fitch*, 537 F.2d at 9; *CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 13 (2d Cir.1975). A descriptive mark is protected only if it has acquired "secondary meaning." 15 U.S.C. § 1052(f) (1982). Suggestive marks are entitled to registration without proof of secondary meaning, as are fully arbitrary or fanciful terms. *Abercrombie & Fitch*, 537 F.2d at 9.

In its motion, Newman asserts that Merritt Forbes is not entitled to protection for the mark "tender option" because it is a generic term. A generic mark is not protected under trademark law under any circumstances. As the Second Circuit explained in *Abercrombie & Fitch Co. v. Hunting World, Inc.:*

[n]o matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the

product of the right to call an article by its name.

537 F.2d at 9. Courts will not grant trademark protection to generic terms, since to do so would effectively grant the owner of the mark a monopoly because a competitor could not describe his goods as what they are. *CES Publishing*, 531 F.2d at 13.

Generic marks are the actual names of the products themselves. *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 117–18, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938) (the words "Shredded Wheat" held to be generic). A generic term is one that refers, or has come to be understood as referring, to the genus or broad classifying term of which the particular product is a species. *Abercrombie & Fitch Co.*, 537 F.2d at 9, *E.R. Squibb*, 536 F.Supp. at 527. Descriptive marks, on the other hand, are those which refer to any feature of the product or service, including its peculiarities, character or purpose. Typically, a generic term is a noun, referring to an entire class, while a descriptive term is an adjective, identifying the special characteristics of an article. 3 Callmann § 18.03. However, the distinction between the two is very often blurred; it is often far from clear whether a term refers to an entire genus or whether it describes a particular product.

Where a mark is not registered, there is no presumption of the mark's validity. Accordingly, in the case at hand, the burden is on Merritt Forbes to prove the validity of its marks and to prove that its unregistered marks are not generic. *Reese Publishing Co. v. Hampton International Communications, Inc.*, 620 F.2d 7, 11 (2d Cir.1980). As to the term "tender option," Merritt Forbes' evidence falls short of the mark. The term "tender option" in the phrase "tender option bond" or "tender option program" cannot be said to constitute a descriptive adjective describing the peculiar qualities (the option to tender) that make this product different from others in its broad genus, that is, all securities in general. Instead, it is a generic term for a separate genus, that is, all securities or

programs that offer the specific feature of allowing the owner to tender them back. The term is generic as it defines the class to which the product in issue belongs. *See, e.g., Loctite Corp. v. National Starch & Chemical Corp.*, 516 F.Supp. 190 (S.D.N.Y. 1981) ("Super glue" held generic.)

The evidence that Merritt Forbes has presented to support the validity of its mark does not affect this determination. Merritt Forbes places great weight on a statement in an Agreement Among Underwriters dated September 14, 1984, apparently used in a recent tender option transaction of its own, to the effect that each participating underwriter acknowledges plaintiff's ownership of the alleged service marks TOP'S, tender option and tender option program. *See* Kolodner Aff. ¶ 19 and Ex.MLK–2, ¶ 15.01. The probative value of this "Agreement" is diminished by the fact that any underwriter wishing to participate in the transaction had no choice but to sign the Agreement Among Underwriters. In addition, this Agreement was generated by plaintiff itself and thus lacks probative value as to whether the mark is protectible or generic. *See Loctite Corp. v. National Starch & Chemical Corp.*, 516 F.Supp. 190, 200 (S.D.N.Y.1981).

More important, however, Newman has presented evidence that despite this Agreement, several of the very brokerage houses who have allegedly acknowledged the validity of plaintiff's service mark "tender option" have recently used that very term in drafting the offering documents for two recent deals. Thus, E.F. Hutton, Craigie Incorporated, Dean Witter Reynolds, Inc. and Paine Webber Incorporated, four of the underwriters listed in the Kolodner affidavit at paragraph 19, as having signed the Agreement Among Underwriters, used the term "tender option" in a Virginia Housing Authority Offering dated October 16, 1984—a month after the date of plaintiff's Agreement Among Underwriters. *See* Waldeck Aff. ¶ 13 and Exh. D thereto. The identical term was also used in a transaction underwritten by E.F. Hutton and L.F. Rothschild, Unterberg & Towbin, an-

other of the underwriters listed in plaintiff's roster. *See* Waldeck Aff. ¶ 14 Exh. E thereto. This use of the term of underwriters also had recently agreed to acknowledge Merritt Forbes ownership of the term demonstrates the inherent genericness of the term "tender option."

Merritt Forbes also relies on an October 1984 newspaper article, which, it claims, establishes press recognition of the service mark "tender option" since that article capitalized the term "tender option." *See* Kolodner Aff ¶ 21 and Ex. MLK–3. Yet that same article referred to the bonds as "such" tender option bonds, suggesting that the term is generic. In any event, as Newman has pointed out, numerous media articles in the same time period have continued to use the term "tender option" and its synonyms generically. *See* Waldeck Aff. ¶¶ 12, 15 and Exh. F thereto.

There appears to be nothing about a security described as including a "tender option" which distinguishes it from any other security including those described as "option tender bonds," "put bonds," "option bonds" or "put option bonds," to which a right to tender is attached. Newman has confirmed by its affidavits that a common understanding exists with respect to such classification of securities. A security which offers a tender option is understood to be one to which an option is attached giving the holder the option to tender the bond prior to its stated maturity.

In *CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11 (2d Cir. 1975), the Court of Appeals held that the case was dismissable because the alleged trademark Consumer Electronics, part of the title of a monthly magazine called Consumer Electronics Monthly about electronic products for consumers, was generic. The Court noted:

> It is hard to think of a name for a magazine, directed deliberately and effectively to industry personnel, which more accurately names the class of trade magazines within that industry than one which simply gives itself the name of the trade plus the word "monthly."

531 F.2d at 15. While the case at hand does not present as clear example of genericness, I am willing as a matter of law to hold that the term "tender option" is generic, despite the conflicting evidence as to the manner in which portions of the securities industry view the term.

The identical reasoning applies to Merritt Forbes' claim that the term "tender option program" represents a valid service mark. Merritt Forbes is not entitled to more protection for the term tender option program than it is for the term tender option simply because the common place and non-distinctive word "program" is added to it. While several generic or descriptive words together may constitute a protectable mark, *see* 3 Callmann at § 18.04, in this case the phrase taken in its entirety represents a generic term. The word "program" in this context is merely a method of conveying the information that a mechanism exists whereby an investor can take advantage of a tender option function. It does not add enough to the generic term tender option to create a new and distinctive term that identifies the services of one person and distinguishes them from another. Because the terms are inherently generic, Newman's motion for summary judgment is granted as to "tender option" and "tender option program."

The mark TOP's, on the other hand, presents a more difficult question. The threshold issue that must be resolved is whether Merritt Forbes has sufficiently alleged use of this mark by Newman. In its complaint, Merritt Forbes alleges "upon information and belief" that defendants "in their oral sales and marketing presentations have used the mark and designation TOP's in reference to and to designate their own services and securities." Complaint, ¶ 24. In its papers submitted in response to this motion, Merritt Forbes offered the affidavit of William Hudson ("Hudson"), a senior vice-president of Marine Midland Bank in Buffalo, New York, who states that in April of 1984 he received a phone call from a man at First Interstate Bank who inquired as to whether Marine

Midland "was interested in purchasing bonds offered under the TOP's securities program" and that after Marine Midland expressed interest they received Newman's offering documents.

In its motion papers, however, Newman focused only on the term tender option, contending that "[s]ince defendant's documents upon which plaintiff has sued do not use the terms "tender option program" or TOP's" ..., the only term about which plaintiff can complain is "tender option." Defendants memorandum, p. 22.

 The mere fact that Newman's alleged use of the term "TOP's" was in an oral sales presentation rather than in its actual papers does not insulate Newman from claims of infringement. Any form of use that could lead to consumer confusion may constitute infringement. 3A Callmann § 21.07 at p. 25. Because the Hudson affidavit alleges that a Newman salesman used the term "TOP's" in connection with its own tender option program, it is sufficient to state a claim for service mark infringement unless the term is inherently generic.

 Unlike the terms "tender option" and "tender option program," "TOP's" may conceivably constitute a valid and protectible service mark. The fact that it is an acronym for the generic term "tender option program" does not necessarily make it in itself generic. 3 Callmann at § 18.04. If an abbreviation is fanciful or arbitrary, it may be entitled to full service mark protection. See Chanel, Inc. v. Suttner, 109 U.S.P.Q. 493 (S.D.N.Y.1956). Commonly understood abbreviations have been held descriptive, see Programmed Tax Systems, Inc. v. Raytheon Co., 419 F.Supp. 1251 (S.D.N.Y.1976), Santa Fe–Pomeroy, Inc. v. P & Z Co., Inc. 569 F.2d 1084 (9th Cir.1978), and in certain situations courts have recognized secondary significance. See Great Atlantic & Pacific Tea Co. v. A & P Radio Stores, 20 F.Supp. 703 (E.D.Pa.1937). If an abbreviation has become generic by virtue of common use, it is not entitled to any protection.

 Because I cannot rule as a matter of law that the term "TOP's" is not inherently generic, the degree to which it is entitled to protection is a factual question inappropriate for summary judgment. Dan Robbins and Associates, Inc. v. Questor Corp., 599 F.2d 1009 (C.C.P.A.1979); Stix Products, Inc. v. United Merchants & Manufacturers, Inc., 295 F.Supp. 479 (S.D. N.Y.1968). Because genuine issues of material fact remain to be resolved, Newman's motion for summary judgment is denied as to the term "TOP's."

### Common Law Service Mark Infringement and Unfair Competition

 Newman has also moved to dismiss Merritt Forbes' common law service mark infringement and unfair competition claims on the grounds that the terms at issue are generic. The test for common law service mark infringement is the same as the test under the Lanham Act: the likelihood that the consuming public will be confused as to the source of the allegedly infringing product. American Footwear Corp. v. General Footwear Co., 609 F.2d 655, 664 (2d Cir.1979), cert. denied, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). A claim of unfair competition based on a violation of property rights requires a similar showing as to the product in general. Id. at 662; James Laboratories, Ltd. v. Approved Pharmaceutical Corp., 438 F.Supp. 1061 (N.D.N.Y.1977). In both cases, a threshold issue is the degree to which a mark is entitled to protection. Because I have determined that the marks "tender option" and "tender option program" are generic, they are not entitled to protection, and Newman's motion to dismiss Merritt Forbes' common law service mark infringement and unfair competition claims as to those terms is granted. Because genuine issues of material fact remain, the motion is denied as to the term "TOP's."

### Misappropriation

 In its complaint, Merritt Forbes contends that the defendants misappropri-

ated "confidential and proprietary information," claiming that certain allegedly confidential documents sent from Merritt Forbes to Security Pacific were used by Newman. To establish a claim of unfair competition based on misappropriation, a plaintiff must show that a confidential relationship existed between the parties, that disclosures of what amounted to trade secrets were made by the plaintiff to the defendants and that the defendants made use of those disclosures. *Heyman v. Winarick, Inc.,* 325 F.2d 584, 586 (2d Cir.1963); *Speedry Chemical Prods., Inc. v. Carter's Ink Co.,* 306 F.2d 328, 331 (2d Cir.1962). Newman now contends that the misappropriation claim must be dismissed because Newman did not have access to the documents in question and therefore did not make use of them.

In support of its motion, Newman submitted affidavits asserting that the copy of Merritt Forbes' presentation package received by an officer at Security Pacific was disclosed only to two lawyers at Security Pacific who did not disclose it to anyone else and that there is no record of an Executive Summary having been received. In response, Merritt Forbes has submitted affidavits asserting that both the presentation package and Executive Summary were sent to various employees of Security Pacific on the understanding that the information in the documents would remain confidential and that several telephone conversations about Merritt Forbes' program took place between Security Pacific and Merritt Forbes, and suggesting that the documents or the information contained therein was transmitted from Security Pacific to Newman.

Newman contends that the evidence submitted by Merritt Forbes is not sufficient to create a general issue of material fact as to whether or not Newman used Merritt Forbes' documents or information. In support, it cites *Vantage Point, Inc. v. Parker Bros., Inc.,* 529 F.Supp. 1204 (E.D.N.Y. 1981), *aff'd* 697 F.2d 301 (2d Cir.1982), a case involving the misappropriation of a game idea in which the question of access was in issue. The court in *Vantage Point*

granted summary judgment on one claim of misappropriation on the grounds that the plaintiff had completely failed to contravert the defendant's evidence of lack of access. The defendants had submitted affidavits from each person involved with game development asserting that they had never seen plaintiff's submission and that their product was developed independently; the plaintiff was unable to submit any factual evidence tending to discredit these affidavits or permitting a reasonable inference of access to be drawn. The court specifically noted, however, that the plaintiff had had "extended opportunity for discovery." *Id.* at 1214.

■ The evidence submitted by Newman may well be sufficient to overcome the prima facie case of access that Merritt Forbes may establish by showing corporate receipt, and to therefore shift the burden of production back to Merritt Forbes. *See Bevan v. Columbia Broadcasting System, Inc.,* 329 F.Supp. 601, 609–10 (S.D.N.Y. 1971). If Merritt Forbes' is unable to produce any further evidence, the evidence submitted by Newman may be dispositive. In the case at hand, however, the parties have had limited opportunity for discovery. Given the difficulty of an outsider establishing that ideas or documents flowed from one area of a firm to another, Merritt Forbes' should be afforded a full opportunity to develop evidence in support of its position. *See Bevan v. CBS, Inc.,* 329 F.Supp. at 610. Because this case is still in its preliminary stages, a summary judgment motion is premature and I cannot rule as a matter of law that no genuine issue of material fact is presented.

For the reasons discussed above, Newman's motions to dismiss and for summary judgment are denied as to the copyright claim and the service mark claim relating to the term "TOP's", denied with leave to renew at the conclusion of discovery as to the misappropriation claim, and granted as to the service mark claims relating to the terms "tender option" and "tender option program."

IT IS SO ORDERED.